STATE *ex rel.* THOMPSON *v.* PARKER.

Opinion delivered November 26, 1917.

1.  NAVIGABLE STREAMS—"HIGH WATER MARK."—In an action to determine the character of, and the right to, the use of a certain area which was formerly land, but which had become permanently overflowed by the waters of a lake, due to the building of a levee across the outlet of the lake, *held*, the area in controversy, prior to the building of the levee, was not a part of the bed of the aforesaid lake. The line delimiting the bed of navigable water from its bank "is to be found by ascertaining where the presence and action of water are so usual and long continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil." *Railway* v. *Ramsey*, 53 Ark. 314.

2.  ADVERSE POSSESSION—LAND PERMANENTLY SUBMERGED BY WATER—STATE ACQUIRES TITLE, WHEN—NAVIGABLE WATERS.—When the waters of a natural navigable lake are extended by artificial means so as to cause the land of riparian owners to be flooded, without their consent, and this condition is not merely temporary but is continued for a sufficient length of time for the standing waters to produce a distinctive new high-water mark for the waters of the lake ·bed, this gives the State, as the owner of such lake bed, the possession of the lands so covered to the high-water mark. Such possession is open, for a complete submergence of one's lands in this manner could not escape observation, and, if the owner is powerless to remove the cause and to restore the lands to their former condition, such possession is also adverse, and if it continues for seven years or more without interruption, the State acquires the title to the lands so submerged, for, in such case they have become a part of the natural lake bed.

3.  NAVIGABLE WATERS—TITLE TO SOIL.—The title to the soil in navigable waters below and to high water mark is in the State in trust for the use of the public.

4.  NAVIGABLE WATERS—TITLE TO SOIL—RIGHT TO HUNT AND FISH.—The common right of hunting and fishing in navigable lakes is not reserved to the public as a right attached and incident to the right of navigation, but it is one that inheres in the public because the State, in trust for the public, is the owner of the soil in navigable waters to high-water mark, and the common right of hunting and fishing is incident to such ownership, as well as the other common right of navigation. The State can not alienate these rights nor abdicate the trust to hold and preserve them for the untrammeled use of the whole people of the State.

Appeal from Crittenden Chancery Court; *Geo. T. Humphries,* Chancellor; reversed.

*E. L. Westbrooke,* for appellant.

1.   Horseshoe is a navigable lake. 119 Ark. 377.

2.   The water and beds of navigable lakes and the fish and fowl therein are the property of the State.   3 How. (U. S.) 212; 20 *Id.* 84; 107 U. S. 678; 206 *Id.* 46; 146 *Id.* 387; 242 *Id.* 272, and many others.   119 Ark. 383; 88 *Id.* 578; Kirby's Digest, § § 4108, 4082, etc.; 16 Peters, 367; 3 How. (U. S.) 212; 209 U. S. 447, etc.; 53 Ark. 314; 29 Cyc. 291.

3.   Happy Jack, Mud and Clear Lakes are State property.   53 Ark. 314; 119 *Id.* 383.

4.   Under the law the present level of the lake is the natural level, where the level of a navigable lake is maintained by artificial means, the rights of the public are correspondingly extended.   The State acquired title by prescription.   50 L. R. A. 836; 70 N. W. 115; 74 *Id.* 185; 91 Am. St. 965; 119 Ark. 383; 104 S. W. 819.

5.   The right of the public to hunt and fish is settled. 56 Ark. 267; 54 Am. Dec. 764; 45 L. R. A. 475; 10 Am. Dec. 356; 21 *Id.* 89; 60 L. R. A. 484; 19 Cyc. 999; 58 Am. St. 33; 53 Am. St. 293; 31 Ann. Cases 777, and many others.   See also 11 R. C. L. 1016, (3) 12 *Id.* 668, etc.

*Brown & Anderson* and *Block & Kirsch,* for appellees.

1.   The submerged lands were initially land and not lake-bed.   119 Ark. 331, 379; 77 *Id.* 338.   They belong to appellee club.

2.   The public has acquired no rights by prescription.   119 Ark. 383, 379, etc.; 75 N. E. 783; 148 Pac. 1073. The right to hunt and fish is a property right.   73 Ark. 235; 55 Atl. 656; 3 Am. St. 152, etc.   To acquire a prescriptive right, there must be an open, definite continuous use, adverse to the owner for seven years.   47 Ark. 66; 79 *Id.* 5; 105 *Id.* 460.   It must be proven.   61 *Id.* 464; 47 *Id.* 277; 76 *Id.* 538.   Every finding of the chancellor is sustained by the evidence and should be affirmed.

WOOD, J.   Horseshoe Lake, doubtless so named because of its shape, is a large body of water situated in Crittenden County, Arkansas.   The Five Lakes Outing Club, of which appellees are the officers and trustees, is the owner of a large body of land within the peninsula of the lake, bordering on its inner rim.   The inner bank of the lake is low and sloping, while the outer bank is high and clearly defined.

In 1905 the Levee Board of the St. Francis Levee District built a levee across the only outlet for the waters of the lake during times of high water and overflow.  This levee caused the waters of the lake to extend and permanently submerge approximately one thousand acres of appellees' lands, whereby same have become a part of the bed of the lake.   This area, being frequented by fish and wild fowl, is a favorite resort for hunting and fishing, and is therefore popularly known as "Happy Jack," is so designated in this record, and hereafter, for convenience, will be so called.

In 1911 the Outing Club attempted by siphon to lower the waters of Horseshoe Lake to their former level and thereby to restore Happy Jack to the condition that existed prior to the building of the levee, but the siphon was a failure, and the appellees now concede that the waters covering Happy Jack cannot be removed therefrom in any legitimate way.   Appellees contend that prior to the building of the levee the highwater mark of Horseshoe Lake did not extend far enough to  include Happy Jack and make it a part of the navigable waters of such lake; that they were therefore the owners of Happy Jack, and as such have the right to exclude the public therefrom for any and all purposes.   They contend that the building of the levee in no manner affected their title and the rights incident thereto.

Appellees further contend that if it should be held that Happy Jack is a part of the bed of Horseshoe Lake, and that appellees have no right to fence the same and thus exclude the public from the use thereof for navigation, that they, nevertheless, as riparian owners, would

have the right to exclude the public from the use thereof for all other purposes, and that a court of equity should mold a remedy to protect this right. The appellant challenges these contentions, hence this suit.

The first question is, was Happy Jack, prior to the building of the levee, a part of the bed of Horseshoe Lake? This is a mixed issue of law and fact.

The testimony for the appellees tended to prove that as early as 1834 there was an official survey of the townships in which Happy Jack is located. The plats and field notes of that survey show that Happy Jack was surveyed as lands and sectionized and divided into the usual government sub-divisions; that Happy Jack, at that time, was covered with a growth of black thorn, cottonwood, maple and honey locust, and had an undergrowth of vines and briars; that this undergrowth extended up to the border of the lake as then meandered by the government surveys and was over all of Happy Jack; that Happy Jack was selected under the Swamp Land Grant and was sold to various parties from whom, through mesne conveyances, appellees deraigned their title; that they had been paying taxes on and claiming to have possession of Happy Jack ever since their purchase; that from July until the winter rains set in Happy Jack was dry and people rode and walked over the same.

The testimony for appellant tended to prove that prior to 1905, and during those years when there was no dam across the outlet for the waters of Horseshoe Lake, from about Christmas until July, Happy Jack was covered with water, and between July and Christmas the land, though dry on the surface, was boggy.

Maps and plats made by civil engineers and surveyers, and photographs made by competent photographers, were in evidence. The latter, however, were taken after the levee was built and since the litigation arose concerning Happy Jack. While they show Happy Jack from various angles as it appeared when these photographs were taken, they do not reveal the appearance of Happy Jack before that time.

(1)   In *St. L., I. M. & S. Ry. Co.* v. *Ramsey*, 53 Ark. 314, we defined "high-water mark" and prescribed the test for ascertaining it as follows (quoting syllabus): "The high-water mark of a navigable stream, the line delimiting its bed from the banks, is to be found by ascertaining where the presence and action of water are so usual and long continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil."

Applying the above to the testimony in this record, we hold that Happy Jack, prior to the building of the St. Francis Levee, was not a part of the bed of Horseshoe Lake. The character of the undergrowth and the nature and condition of the soil itself prior to that time were such as to give it a distinctive character as land rather than water. The high-water mark delimiting the line between the bed of the lake and its banks did not extend far enough out to embrace Happy Jack and thus render it a part of the bed of the lake. The title to Happy Jack at that time, therefore, was in the appellees and not in the State. Appellees at that time would have had the right, by delimiting and enclosing this territory, to exclude the public from access thereto for any and all purposes.

The next and only remaining question is, what effect, if any, did the building of the St. Francis Levee have upon the title of appellees and their rights as riparian proprietors? The facts concerning this are already stated; they are undisputed, and this issue therefore is purely one of law.

The State, as trustee for the public, has acquired title to Happy Jack by prescription. This is so because when the St. Francis Levee District, a governmental agency, built the levee such levee caused Happy Jack to become a part of the bed of Horseshoe Lake. This condition, notwithstanding the efforts put forth by appellees to counteract it, has already existed for more than seven years, and appellees admit must continue to exist for all

time to come. Under such circumstances the artificial level of the lake to high-water mark must be regarded as the natural level, and treated as such in determining the title and rights of riparian owners whose lands have thus been made a part of the permanent lake bed.

In *Diana Shooting Club* v. *Lamoreux,* 114 Wis. 44, 91 Am. St. Rep. 898, 905, it is said: "True, also, if an artificial lake is created, or artificial level of a natural lake is caused by the erection of a dam, and such condition is allowed to exist adversely for the full statutory period necessary to change the ownership of the land affected thereby, the former owner thereof can not thereafter object to a continuance of such condition. By operation of the statute of limitations the artificial condition is thus stamped with the character of a natural condition, and the title to the lands covered by the waters or the lake is deemed to have passed from private ownership to the same trust as that of lands covered by the waters of natural navigable lakes."

It is held in the well considered cases of *Railway* v. *Ramsey, supra,* and *Barboro v. Boyle,* 119 Ark. 383, that the title to the bed of navigable waters in our State, that is, the title to the bed of such waters to high-water mark, is in the State. The character of such title is well expressed in the case of *Pewaukee* v. *Savoy,* 50 L. R. A. 836, 103 Wis. 271, as follows: "Upon the admission of the State into the Union the title to such lands, by operation of law, vested in it in trust to preserve to the people of the State forever the common rights of fishing and navigation and such other rights as are incident to public waters at common law, which trusteeship is inviolate, the State being powerless to change the situation by in any way abdicating its trust."

(2) When the waters of natural navigable lakes in this State are extended by artificial means so as to cause the land of riparian owners to be flooded, without their consent, and this condition is not merely temporary, but is continued for a sufficient length of time for the standing waters to produce a distinctive new high-water mark

for the waters of the lake bed, this gives the State, as the owner of such lake bed, the possession of the lands so covered to the high-water mark. Such possession is open, for a complete submergence of one's lands in this manner could not escape observation, and, if the owner is powerless to remove the cause and to restore the lands to their former condition, such possession is also adverse, and if it continues for seven years or more without interruption the State acquires the title to the lands so submerged, for, in such case, they have become a part of the natural lake bed. Such is the case here, and, as already observed, the State has acquired title by prescription or limitation. *Johnson* v. *Lewis,* 47 Ark. 66; *Clay* v. *Penzel,* 79 Ark. 5; *C. O. & G. R. R. Co.* v. *Rice,* 104 S. W. 819; *Medlock* v. *Owen,* 105 Ark. 460.

Learned counsel for appellees argue that since no one can acquire a right of hunting and fishing by prescription upon the unenclosed lands of another in this State, that, by analogy, neither can the State, for the use of the public, acquire such right by prescription on unenclosed submerged lands that have become a part of navigable lakes. But there is no analogy in such cases. Occasional or oft-repeated incursions upon the lands of another for the purpose of hunting and fishing does not signify any intention to appropriate the lands to one's own use. The act of hunting and fishing on the unenclosed lands of another is not an act of possession. It does not denote any purpose to hold the same adversely and thereby exclude the owner from dominion over his property, and it does not have any such effect. But if one should go upon the unenclosed lands of another without his consent and erect fences and construct artificial ponds for the propagation and preservation of wild game and fish, with a view of making the same his own game preserves, then all such acts would be a taking and holding adverse to the true owner, for that would deprive him of complete dominion over his property. The facts of this record are more analogous to the latter case, for here the inundation of the appellee's lands, under the circum-

stances, put the State in possession and as effectually foreclosed any private ownership and dominion in the appellees as if they had been barred therefrom by a stone wall or a wire fence. Of course, appellees, being still the owners of the lands bordering on the lake to high-water mark, would have certain riparian rights which other members of the public would not have, but which are not germane to this controversy. They would have the same common right of hunting and fishing in such waters as other members of the public would have.

(3) Appellees contend that even if it be conceded that Happy Jack is a part of the lake bed or permanent waters of Horseshoe Lake, and that if it be conceded that this fact would vest in the public an easement for the purpose of navigation in all of the navigable waters of Horseshoe Lake, that nevertheless the right of hunting and fishing on one's own lands is a private right which inheres in the ownership of the soil and is not in any manner incident to or dependent upon the public easement of navigation, and that they, as the record owners of the soil of Happy Jack, would have the exclusive right of hunting and fishing thereon so long as they exercised such right in a manner consistent with the public's right to use the waters for the purposes of navigation; that therefore they would have the right to enclose such parts of Happy Jack as were not in fact susceptible of navigation and to thereby exclude the public from the right of hunting and fishing within such enclosure. They further contend that, being the record owners of the soil, they have the exclusive right to hunt and fish on the waters of Happy Jack that are not in fact navigable, and that if it would interfere in any manner with the public right of navigation to enclose such waters, a court of equity should mold them a remedy by in some manner delimiting the navigable from the unnavigable portions of Happy Jack and granting them injunctive relief against encroachments upon the unnavigable portions. Appellees cite us to the case of *Schlute* v. *Warren,* 218 Ill. 108, 75 N. E. 783, which seems to sustain the appellees

in this contention. See also *Knudson et al.* v. *Hull et al.,* 148 Pac. 1070. But these contentions, we believe, are in conflict with the weight of authority and with the decisions of this court, which hold, under laws like ours, that the title in the soil in navigable waters below and to high-water mark is in the State in trust for the use of the public.

(4) The common right of hunting and fishing in such navigable waters is not reserved to the public as a right attached and incident to the right of navigation, but it is one that inheres in the public in our State because the State, in trust for the public, is the owner of the soil in navigable waters to high-water mark, and the common right of hunting and fishing is incident to such ownership, as well as the other common right of navigation. In our State these are independent rights, and both alike belong to the class of common rights which King John essayed to hold as private and individual, exclusive of the public, but which the Barons wrested from him, and which were vested by the Magna Charta in the Crown (the State) for the benefit of the public. These rights have come down to us from the common law and are reserved under our "Great Charter" to the States respectively to be held in trust for the benefit of the people. ***Pollard's Lessee*** v. *Hagan,* 3 Howard, 213. See *Lewis* v. *State,* 110 Ark. 204.

The State can neither alienate these rights nor abdicate the trust to hold and preserve them for the untrammeled use of the whole people of the State.

Therefore, since the appellees have no title to Happy Jack, there is no room for a court of equity to apply the maxim, "Where there is a right there is a remedy."

But counsel insist that this court held in *Barboro* v. *Boyle, supra,* that the title to Happy Jack was in appellees. Before and at the time of the building of the levee across the outlet to Horseshoe Lake the appellees were the owners of some 3,000 acres of lands, including Happy Jack, bordering on the inner rim of the lake. The Outing Club, through its trustees, instituted a suit, setting

up that Horseshoe Lake was non-navigable; that they were the owners of the lands that had been inundated by the waters of Horseshoe Lake by reason of the building of the levee to the center of such lake; that their efforts to siphon the same were of no avail, and that the overflowed condition was permanent, and they asserted that they had the exclusive right, as private owners, to hunt and fish on the lands covered by these waters to the center of the lake, and asked an injunction to exclude the public from hunting and fishing thereon. The plaintiffs in that suit are the appellees here, and the appellants, for the purposes of this suit, may be considered as the defendants to that. The defendants to that suit denied the rights asserted by the plaintiffs, and on appeal from a judgment of the chancery court in that case we held, briefly summarizing the opinion: that Horseshoe Lake was navigable; that the State was the owner of the lake bed to high-water mark; that "there was nothing on the banks adjacent to the plaintiffs' lands to indicate where the high-water mark is," and that an injunction should not issue because the lands of the plaintiffs (appellees here) were not enclosed. In the course of the opinion this language was used: "It may be said that the St. Francis Levee District was given the power to construct a levee, and, by the exercise of the right of eminent domain, to take whatever lands were necessary for that purpose. They did not acquire the lands of plaintiffs either by purchase or by the exercise of the right of eminent domain, and therefore plaintiffs had the right to pump the water out of the lake so that the waters might be restored to their former level, and thus prevent the flooding of their lands."

Appellees quote and rely upon the above language as *res adjudicata* of title in their favor. This language is correct. The State had not acquired the title to appellees' lands by purchase nor by condemnation. But it does not follow that the State does not have the title by prescription. If the appellees had succeeded within seven years after the building of the levee, in pumping

off the waters and restoring Horseshoe Lake to its former level, then the possession of the State to the lake bed would have been interrupted. But the futile efforts of appellees to siphon the lake did not interrupt or break the State's possession. Just following the above language the court continues: "When this right is conceded to plaintiffs, it is contended by their counsel that the chancery court erred in defining the limits of their lands upon which the defendants might hunt and fish. But we need not consider this question for the reason that we are of the opinion that the chancellor should not have issued any any injunction." And further on in the opinion the court used the following language: "The banks of the lake on the outer rim are steep, but the inside banks next to the lands of the plaintiffs are sloping. The land rises gradually, and it is difficult to tell where the high-water mark is on that side of the lake. As we have already seen, the title to the bed of the lake to high-water mark is in the State for the use of the public, and the public have a right to hunt and fish therein: There is nothing on the bank adjacent to plaintiffs' land to indicate where the high-water mark is; and, under these circumstances, we do not think the bank of the lake is sufficient indication of the ownership of the plaintiffs, taken in connection with the artificial barriers, to constitute an enclosure." We further said that the plaintiffs "have the exclusive right to hunt and fish on their own lands when they are enclosed."

It is manifest when the language of the opinion is taken as a whole, in connection with the issues there being discussed, the court did not hold that the title to "Happy Jack," the subject matter of this controversy, was in the appellees. On the contrary, the court expressly declined to consider that question; and therefore it is a misinterpretation of the opinion to construe it as foreclosing and settling the issue as to the title to Happy Jack, as presented by this appeal.

It follows that the court erred in dismissing appellant's complaint, and for this error the decree is reversed

and the cause is remanded with directions to enter a decree granting the appellant the relief prayed for.

McCULLOCH, C. J. (concurring).  I concur in the conclusion reached by the court in this case and also approve, in the main, the general principles on which the decision is based, but it seems to be a misapplication of terms to say that the State acquired title to "Happy Jack" by prescription or by limitations.  Neither is it correct, in my opinion, to say that the "futile efforts of appellees to siphon the lake did not interrupt the State's possession."  We held in *Barboro* v. *Boyle,* 119 Ark. 377, that the owners of this land did not lose their title by reason of its inundation by artificial means and that they had the right to restore the land to its former condition by siphoning off the water so as to prevent the public from acquiring title by prescription.  Such was, I think, the necessary effect of the language of the opinion in that case, and it is too narrow an interpretation of that language to say that it only meant that title was not acquired by purchase or by condemnation.  If the owners had not then lost their title by prescription or limitation, they have not lost it now by those means.  It has not been seven years since the owners abandoned their futile efforts to siphon the water off, and I think that the continued efforts of the owners to restore the land to its former condition prevented the public from acquiring title.  As long as the owners continued those efforts the possession of the public was not hostile so as to put the statute of limitation in motion, but on the contrary, the public use was so far permissive as not to create a right by prescription.

But I think the decision reaching the result announced ought to be put on the ground that the owners have confessedly abandoned their effort to restore this land to its former condition, and that under those circumstances they cannot assert private rights in the land covered by navigable waters.  The owners concede, in other words, that they cannot restore the *locus in quo* from navigable water to land and have abandoned their

efforts to do so; therefore, the rights of the public to the ownership as in navigable waters is established and the former rights of the original owners must be treated as abandoned rights. As long as the owners made reasonable efforts to restore the land, their rights were not lost by reason of the public use of the artificially created body of navigable waters, but when they abandoned those efforts the public rights began where theirs ended. They cannot assert private rights in a navigable body of water which cannot, the proof shows, be restored to its former status as land.