[S.F. No. 24035. Mar. 20, 1981.]

THE STATE OF CALIFORNIA et al., Petitioners, v.
THE SUPERIOR COURT OF PLACER COUNTY, Respondent;
CHARLES F. FOGERTY et al., Real Parties in Interest.

COUNSEL

George Deukmejian, Attorney General, N. Gregory Taylor and Jan Stevens, Assistant Attorneys General, David B. Judson, Richard M. Frank and Stephen H. Mills, Deputy Attorneys General, for Petitioners.

No appearance for Respondent.

Edgar B. Washburn, Barbara L. Gately, Washburn, Kemp & Wagenseil and William T. Chidlaw for Real Parties in Interest.

OPINION

**MOSK, J.**—The present action is concerned with the ownership of lands between high and low water in Lake Tahoe, a navigable lake in which there is no appreciable ebb and flow of the tide. The primary issues are the same as those discussed in *State of California* v. *Superior Court (Lyon)* (1981) *ante*, page 210 [172 Cal.Rptr. 696, 625 P.2d 239], but some questions in addition to those in the *Lyon* action are raised by the parties.

In the spring of 1977, the State Lands Commission, after being advised by the Attorney General that the state claimed ownership of the property between high and low water in navigable nontidal lakes and rivers, proposed to record claims to such lands in the offices of county recorders throughout the state.

Thereupon, Charles and Stella Fogerty and other owners of property along the shore of Lake Tahoe, and Tahoe Shorezone Representation, a corporation which represents many shoreline owners, filed this action for declaratory relief and inverse condemnation, and claimed violation of their civil rights (42 U.S.C. § 1983).[1] The complaint alleged that plaintiffs owned the lands between high and low water in the lake in fee simple, that many of them had built piers or docks extending to low water, and that the state wrongfully asserted title or a public trust to high water. Plaintiffs sought an injunction to prevent the state from claiming any interest in the property between high and low water. As defendants in the action, they joined the state, the State Lands Commission, and several state officials (hereinafter called the People).

After overruling the demurrers of the People and granting plaintiffs a preliminary injunction prohibiting the state from recording a notice that it owns the lands between high and low water in Lake Tahoe, the trial court granted plaintiffs' motion for partial summary judgment. It ruled that no portion of the property involved in this action landward of the last natural low water mark of Lake Tahoe is or ever was sovereign property of the state or subject to the common law public trust for

---

[1]Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

commerce, navigation and fishing, and it denied the motions for partial summary judgment and for partial judgment on the pleadings filed by the People. Thereafter, the People filed this proceeding, seeking a peremptory writ of mandate to direct the trial court to vacate its order granting plaintiffs' motion, and to enter an order granting the motions made by the People.

The major issue raised by the plaintiffs, not discussed in *Lyon*, is that of estoppel. Strictly speaking, that issue is not formally before us. Plaintiffs' complaint pleads a cause of action for declaratory relief in estoppel, but their motion for partial summary judgment did not seek a ruling on this issue, and the trial court did not pass upon the question. The People, urging that plaintiffs should not be permitted to raise the issue, assert that estoppel is a question of fact for the trial court in any future proceeding. This argument is technically tenable. But if estoppel were to be determined on a case-by-case basis it would require a massive expenditure of time and money by the state, riparian landowners, and the judiciary. Such an effort may be avoided if, as we shall conclude, we can decide the question as a matter of law on the basis of the present record. (Cf. *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 487-488 [91 Cal.Rptr. 23, 476 P.2d 423].)

■ ■■■ The elements of equitable estoppel were described so thoroughly by Justice Sullivan in *Mansell* that little more need be said on the subject.[2]

■ Since we find that one critical requirement for the application of the doctrine is absent, we need not discuss other aspects of the doctrine or their relevance to the present case. Estoppel will not be applied to the government if the result would be to nullify a strong rule of policy adopted for the benefit of the public (*Mansell*, 3 Cal.3d at p. 493), and we entertain no doubt that this would be the result if we were to hold that the People are barred from asserting the public trust in the lands at issue.

---

[2]There are four elements necessary to apply the doctrine: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (3 Cal.3d at p. 489.)

We note that the opinion of the Attorney General referred to in *Lyon* declares that the public trust applies to the land in question (43 Ops.Cal.Atty.Gen. 288, 294 (1964)), and that it has long been settled in this state that the fact a private landowner has title to tidewaters does not establish such ownership is free of the interest of the public. (See, e.g., *People* v. *California Fish Co.* (1913) 166 Cal. 576 [138 P. 79].)

As we point out in *Lyon*, our decision will affect the rights of the public in 4,000 miles of shoreline along 34 navigable lakes and 31 navigable rivers, and many thousands of acres of land between high and low water (the shorezone). Amicus curiae in the *Lyon* action, the California Department of Water Resources, points out that the shorezone has been reduced to a fraction of its original size in this state by the pressures of development. Such lands now cover less than one half of 1 percent of the state; a further reduction by 15 percent was projected for 1980. Some authorities have warned that at the present rate of destruction nearly all riparian vegetation on the Sacramento River could be eliminated in the next 20 years.

The shorezone is a fragile and complex resource. It provides the environment necessary for the survival of numerous types of fish (including salmon, steelhead and striped bass), birds (such as the endangered species: the bald eagle and the peregrine falcon), and many other species of wildlife and plants. These areas are ideally suited for scientific study, since they provide a gene pool for the preservation of biological diversity. In addition, the shorezone in its natural condition is essential to the maintenance of good water quality, and the vegetation acts as a buffer against floods and erosion.

The close relationship of the life forms in the shorezone to one another and to the condition of the bed of the stream or lake, the delicate balance among them, and the adverse effects of reclamation and development of these areas have been documented in numerous studies and reports. (E.g., U. S. Dept. of Agr., Forest Service (1973) Gen. Plan for Management of Nat. Forest Lands, Lake Tahoe Basin, Review Draft, Lake Tahoe Management Unit, South Lake Tahoe, pp. 1-2; Cal. Dept. Fish and Game (1974) Fish and Wildlife Res. of Anderson Marsh, Clear Lake, Lake County; Cal. Dept. Fish and Game (1966) 1 Fish and Wildlife Plan, p. 14.) One commentator has observed: "[T]he argument is now common place that these environments are the earth's most biologically productive.... If nature bats last, wetlands may be the natural team's designated hitter." (Nash, *Who Loves a Swamp?* in Strategies for Protection and Management of Floodplain Wetlands, etc., a Symposium (USDA Forest Service, GTR-WO-12, Dec. 11-13, 1978.)) The recreational use of these areas for picnicking, hunting, fishing, hiking, birdwatching and nature study does not require elaboration to any Californian. In *Marks v. Whitney* (1971) 6 Cal.3d 251, 259-260 [98 Cal.Rptr. 790, 491 P.2d 374], Justice McComb made the following comment for a unanimous court regarding

the public uses of tidelands: "There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is a preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." That observation is equally applicable to the shorezone.

The Legislature has recognized the value of the shorezone by enacting statutes calling for its protection. (Pub. Resources Code, §§ 5093.50, 5811.) Section 5811 provides that "the remaining wetlands of this state are of increasingly critical economic, aesthetic, and scientific value to the people of California, and...there is need for an affirmative and sustained public policy and program directed at their preservation, restoration, and enhancement, in order that such wetlands shall continue in perpetuity to meet the needs of the people."

We are not convinced by the assertion that these considerations do not rise to the level of a strong public policy in favor of retaining the public trust in the shorezone. Plaintiffs argue that a large percentage of the shoreline of Lake Tahoe is presently devoted to public use either because of public ownership or the public utilization of privately owned shoreline facilities such as marinas, that the problems at Lake Tahoe are related to a large influx of people which contributes to the pollution of the lake, that the public beach areas are overused and the forest cover destroyed by motor vehicles, and that the best preserved areas of the lake are in private ownership. Thus, they urge, the public interest in preservation of the scenic beauty of the lake would be enhanced by private rather than public ownership of the shorezone. Moreover, it is argued, owners are limited in their use of the shorezone by many regulations designed to protect the ecology of the area,[3] and these are adequate to protect the public's interest.

---

[3] For example, state law requires mitigation of adverse environmental effects of a project (Pub. Resources Code, § 21000 et seq.), development which will obstruct the flow of a river or lake or which uses material from a stream bed must be approved by the Department of Fish and Game to determine whether it will adversely affect fish and wildlife (Fish & G. Code, § 1603); the California Tahoe Regional Planning Agency has broad powers to enact ordinances for the regulation of improvement at the lake (Gov. Code, § 67100), and 10 percent of the wetlands in the state are protected by a law providing for the formulation of a plan to control development of Suisun Marsh (Pub. Resources Code, § 29000 et seq.).

Amicus curiae, the California Land Title Association, in a brief filed in the *Lyon* action, asserts that the People exaggerate the ecological importance of the shorezone since not all shorezone areas are of ecological importance, some of the most significant being located above high water or below low water. It is also argued that the imposition of a trust on behalf of the public will not necessarily provide the ecological benefits which the People envision. That goal can be better accomplished on a project-by-project basis in which ecological concerns can be dealt with and private improvements prohibited, limited, or modified, depending on the ecological needs of the area involved.

Whether or not the shorezone of Lake Tahoe would be better preserved if privately owned than if the public has an interest therein is not determinative, since we are not concerned here with recreation only, nor with Lake Tahoe alone, but with a principle which will apply to 4,000 linear miles along all the navigable lakes and rivers in California, in many of which the conditions may well differ in some respect from those at Lake Tahoe. Preservation of the public trust in the shorezone will allow the state flexibility in determining the appropriate use of such land, so that, for example, areas which are endangered by overuse can be closed to certain activities such as public bathing. A number of the considerations advanced by plaintiffs and amicus would call also for abdication of the tidelands trust and the substitution of regulation of tidelands development for the concept of the public's right to control such lands as a matter of right. These arguments appear to oppose the established public trust doctrine in principle, rather than its application to the shorezone as such.

The exercise of the police power has proved insufficient to protect the shorezone. The urgent need to prevent deterioration and disappearance of this fragile resource provides ample justification for our conclusion that the People may not be estopped from asserting the rights of the public in those lands.

■ One question remains: whether the boundary between public and private ownership should be determined with reference to Lake Tahoe in its current condition, or the "natural" level of the lake as it existed prior to the construction of a dam in 1870, which had the effect of raising the level of the lake. (See 30 Ops.Cal.Atty.Gen. 262, 267-268 (1957).) The trial court concluded that the appropriate boundary between public and private ownership is to be measured in accordance with the "last natural" low water mark of the lake. Plaintiffs argue in

favor of the trial court's ruling, while the People assert that the boundary should be fixed by assessing the lake in its current condition.

There is no direct authority on this issue in California. While there is authority relating to a landowner's right to accretions and relictions[4] and to the maintenance of a body of water at its existing level,[5] the issue in the present case revolves around rights in land between the natural water level of a lake and its current shoreline as raised by a dam constructed many decades ago. The People point out that it would be difficult (and probably impossible in some cases) to reconstruct the natural water level of a lake. There are hundreds of dams in California, some dating back to the early days of statehood. (Dept. of Wat. Resources, Dams Within Jurisdiction of State of Cal. (1976) Bull. No. 17-76.) The monumental evidentiary problem which would be created by measuring the boundary line between public and private ownership in accordance with the water level which existed prior to the construction of these dams provides a convincing justification for accepting the current level of the lake as the appropriate standard.

Moreover, the dam at Lake Tahoe has been in existence since 1870, long past the period required for the acquisition of prescriptive rights by the state in the lands in question. (Civ. Code, § 1007; Code Civ. Proc., § 325.) It has been held in other jurisdictions that a landowner loses ownership of property covered by water resulting from the construction of a dam if the condition has continued for the period required for the acquisition of prescriptive rights. (*State v. Parker* (1918) 132 Ark. 316 [200 S.W. 1014, 1016]; *State v. Sorenson* (1937) 222 Iowa 1248 [271 N.W. 234, 238-239].) *Sorenson* stated that in these circumstances "the artificial condition is...stamped with the character of a natural condition, and the title to the lands covered by the waters of the lake is

---

[4]Section 1014 of the Civil Code provides that where land forms by imperceptible degrees from natural causes upon a river or stream by accumulation of material or the recession of the stream, it belongs to the owner of the bank. In *Carpenter v. City of Santa Monica* (1944) 63 Cal.App.2d 772, 794 [147 P.2d 964], the court refused to apply this statute to tidelands, deciding that artificial accretions to tidelands belong to the state, because to hold otherwise would indirectly convey public tidelands into private ownership.

[5]Some cases hold that a landowner has a vested interest in a long-continued diversion of water by the state if he has made substantial expenditures in reliance upon the diversion (*Natural Soda Prod. Co. v. City of L. A.* (1943) 23 Cal.2d 193, 197 [143 P.2d 12]; *Chowchilla Farms Inc. v. Martin* (1933) 219 Cal. 1, 18 [25 P.2d 435]), and that he may recover damages if the level of a lake is lowered (*City of Los Angeles v. Aitken* (1935) 10 Cal.App.2d 460, 472 [52 P.2d 585]).

deemed to have passed from private ownership to the same trust as that of lands covered by the waters of natural navigable lakes. The state, and private owners, as well, of lands affected by the artificial condition, may enforce the maintenance of that condition." (Cf. *Chowchilla Farms Inc.* v. *Martin, supra,* 219 Cal. 1, 18; *Natural Soda Prod. Co.* v. *City of L. A., supra,* 23 Cal.2d 193, 197.)

We hold that, under all the circumstances, the trial court erred in its conclusion that the "last natural" low water mark of Lake Tahoe is the appropriate standard by which to measure the boundary between public and private ownership.

■ We emphasize, as we did in *Lyon,* that these plaintiffs may use the shorezone for any purposes which are not incompatible with the public trust. Landowners who have previously constructed docks, piers and other structures in the shorezone may continue to use these facilities unless the state determines, in accordance with applicable law, that their continued existence is inconsistent with the reasonable needs of the trust. In that event, both statute and case law require that plaintiffs be compensated for the improvements they have constructed in the shorezone. (Pub. Resources Code, § 6312; *Illinois Central Railroad* v. *Illinois* (1892) 146 U.S. 387, 455 [36 L.Ed. 1018, 1043, 13 S.Ct. 110]; *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 534 [162 Cal.Rptr. 327, 606 P.2d 362].)

Let a writ of mandate issue directing the trial court to vacate its order granting plaintiffs partial summary judgment, and to grant the People's motion for partial summary judgment and partial judgment on the pleadings, insofar as consistent with the views expressed above.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

CLARK, J., Dissenting.—For the reasons stated in my concurring and dissenting opinion in *State of California* v. *Superior Court (Lyon)* (1981) *ante,* page 210, [172 Cal.Rptr. 696, 625 P.2d 239], the public trust declared today by the majority applies only to tide and submerged lands and does not apply to the shorezone. While the shorezone at Lake Tahoe may be a ring around the lake only a few feet in width, shorezones on navigable streams encompass hundreds of square miles which are presently in productive use for other than trust purposes, and we should not at this late date declare such uses unlawful.

I must also dissent from the majority's conclusion that the People may not be estopped from asserting the trust. The holding of the sole authority relied on by the majority, *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], is directly contrary to today's decision.

In *Mansell*, the City of Long Beach had claimed portions of a residential subdivision were tidelands subject to the trust. Estoppel was urged on the ground: "[T]he subject lands were filled and improved with the knowledge and acquiesence of the state and city and...since annexation of the area in 1923 the city has exercised full municipal jurisdiction over it—granting building permits, approving subdivision maps, constructing and maintaining streets and city services, collecting taxes." (*Id.*, at p. 487.)

This court first discussed estoppel as applicable to private parties in land title cases, concluding that the circumstances would be sufficient to estop private claims. The court continued: "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. (*United States Fid. & Guar. Co.* v. *State Board of Equalization* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034] and cases there collected.)' (*Driscoll* v. *City of Los Angeles, supra*, 67 Cal.2d 297, 306 [61 Cal.Rptr. 661, 431 P.2d 245].) (See generally 28 Am.Jur.2d, Estoppel and Waiver, §§ 122-133, pp. 782-802; 31 C.J.S., Estoppel, §§ 138-147, pp. 675-733.) Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public,...' (*County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747], see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." (*Id.*, at p. 493.)

After lengthy discussion of the leading cases on the issue of estoppel against government, *Mansell* distilled the controlling rule: "After a thorough review of the many California decisions in this area, as well as a consideration of various out-of-state decisions, we have concluded that the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a

failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.*, at pp. 496-497.)

The court concluded that the great injustice to homeowners which would result from failure to uphold an equitable estoppel against the state and city justifies the minimal effect upon public policy resulting from raising an estoppel. (*Id.*, at p. 501.)

The majority in the instant case rely upon the language quoted above that "an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public,...'" The majority conclude that establishing trust rights to the shorezone is so important that the People may not be estopped as to thousands of linear miles of shorezone. (*Ante*, pp. 244-247.)

The majority decision is arbitrarily contrary to *Mansell*. That case established that in appropriate circumstances the People could be estopped to assert the trust, when the resulting injustice would outweigh the public policy. There are no doubt, thousands of homeowners in cities of the Sacramento and San Joaquin Valleys, as well as other areas of the shorezone, in substantially the same position as were the homeowners in Long Beach. These homeowners, and thousands of farmers will suffer thousands of "great injustices," clearly outweighing the public trust loss in respect to individual lands. (3 Cal.3d at p. 501.)

While it would be a tremendous burden on the judicial system to determine in individual cases whether imposition of the trust involves "great injustice" outweighing trust detriment, the courts' business is the administration of justice. However burdensome the alleviation of "great injustice" may be, courts should not shirk their duty.

I would deny mandate.

Richardson, J., concurred.

The petitions of real parties in interest for a rehearing were denied April 29, 1981. Richardson, J., was of the opinion that the petitions should be granted.