1999 ND 75

STATE of North Dakota ex rel. David SPRYNCZYNATYK, North Dakota State Engineer, Plaintiff and Appellee,

v.

William R. MILLS, Betty L. Mills, Dakotaville, Inc., a North Dakota Corporation, and River Woods West, Inc., a North Dakota Corporation, Defendants and Appellants.

No. 980127.

Supreme Court of North Dakota.

April 27, 1999.

Charles M. Carvell (argued), Assistant Attorney General, Bismarck, ND, for plaintiff and appellee.

William R. Mills (argued), pro se, Bismarck, ND.

Sherry Mills Moore, Foss & Moore, Bismarck, ND, for defendants and appellants Betty L. Mills, Dakotaville, Inc., and River Woods West, Inc.

VANDE WALLE, Chief Justice.

[¶ 1] William R. Mills, Betty L. Mills, Dakotaville, Inc., and River Woods West, Inc. ("Mills") appeal from a judgment determining the ordinary high watermark of the Missouri River on certain disputed property. We conclude the trial court did not err in determining the ordinary high watermark based upon the current condition of the river, and we affirm.

## I

[¶ 2] The State brought a declaratory judgment action to determine the parties' interests in certain land lying along the Missouri River near Bismarck. The disputed land constitutes approximately 62 acres of "shore zone," the area between the ordinary high watermark and ordinary low watermark of the river. *See State ex rel. Sprynczynatyk v. Mills*, 523 N.W.2d 537, 538 (N.D.1994) ("*Mills I*"). The land is bounded on the east by Riverwood Drive and by the river to the west. Mills owns the land above the ordinary high watermark.

[¶ 3] In *Mills I*, 523 N.W.2d at 544, we held the parties have correlative, overlapping rights in the shore zone. Upon remand, the trial court determined the only issue remaining was to set the boundary of the ordinary high watermark. After a trial, the court determined the ordinary high watermark was "at the western edge of Riverwood Drive, the road bordering the property."

## II

[¶ 4] Mills asserts the trial court erred in setting the ordinary high watermark based upon the current level of the river, which is largely regulated by operation of the dam system on the Missouri River by the United States Army Corps of Engineers. Mills contends that, prior to the completion of Garrison Dam in the 1950s, the disputed land was above the ordinary high watermark. With controlled releases from Garrison Dam, however, the land is now covered with water for much of the year. Mills argues the ordinary high watermark should be determined by river levels in their natural, pre-dam state, rather than upon the artificial conditions created by the Missouri River dam system. We disagree.

[¶ 5] The state owns the beds of all navigable waters within the state. *E.g., J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.*, 423 N.W.2d 130, 132 (N.D.1988). As established in *Mills I*, the state has rights in the property up to the ordinary high watermark. The ordinary high watermark is ambulatory, and is not determined as of a fixed date. *See In re Ownership of the Bed of Devils Lake*, 423 N.W.2d 141, 143–44 (N.D.1988). Thus, the state's ownership of land along the Missouri River is determined by "the bed of the stream as it may exist from time to time." *Hogue v. Bourgois*, 71 N.W.2d 47, 52 (N.D. 1955); *see also Devils Lake*, 423 N.W.2d at 144; *Jennings v. Shipp*, 115 N.W.2d 12, 13 (N.D.1962). "Where a water line is the boundary line of a given lot, that line, no matter how it shifts, remains the boundary." *Oberly v. Carpenter*, 67 N.D. 495, 274 N.W. 509, Syll. ¶ 5 (1937), *quoted in Devils Lake*, 423 N.W.2d at 144.

[¶ 6] Mills cites no authorities to support his assertion that the ordinary high watermark must be determined based upon pre-dam water levels, and that an artificial, manmade change cannot affect the ordinary high watermark. Rather, the law in cases from other jurisdictions indicates the ordinary high watermark is to be determined based upon the current condition of the river, even if that condition has been affected by artificial changes. *See State v. Superior Court*, 29 Cal.3d 240, 172 Cal.Rptr. 713, 625 P.2d 256, 260–61 (1981); *Board of Trustees v. Walker Ranch*, 496 So.2d 153, 155 (Fla.Dist. Ct.App.1986); *State ex rel. O'Connor v. Sor-*

*enson,* 222 Iowa 1248, 271 N.W. 234, 238 (1937).

[¶ 7] In *State v. Superior Court,* 172 Cal. Rptr. 713, 625 P.2d at 261 (citations and footnotes omitted), the California Supreme Court explained:

> While there is authority relating to a landowner's right to accretions and relictions and to the maintenance of a body of water at its existing level, the issue in the present case revolves around rights in land between the natural water level of a lake and its current shoreline as raised by a dam constructed many decades ago. The People point out that it would be difficult (and probably impossible in some cases) to reconstruct the natural water level of a lake. There are hundreds of dams in California, some dating back to the early days of statehood.... The monumental evidentiary problem which would be created by measuring the boundary line between public and private ownership in accordance with the water level which existed prior to the construction of these dams provides a convincing justification for accepting the current level of the lake as the appropriate standard.
>
> Moreover, the dam at Lake Tahoe has been in existence since 1870, long past the period required for the acquisition of prescriptive rights by the state in the lands in question.... It has been held in other jurisdictions that a landowner loses ownership of property covered by water resulting from the construction of a dam if the condition has continued for the period required for the acquisition of prescriptive rights. ( ... *State v. Sorenson* (1937) 222 Iowa 1248, 271 N.W. 234, 238–239.) *Sorenson* stated that in these circumstances "the artificial condition is ... stamped with the character of a natural condition, and the title to the lands covered by the waters of the lake is deemed to have passed from private ownership to the same trust as that of lands covered by the waters of natural navigable lakes."

The Iowa Supreme Court further explained in *Sorenson,* 271 N.W. at 238:

> While we find no Iowa cases directly in point upon this question, it seems to be the rule generally adopted in other jurisdictions, that riparian rights will be acquired along the artificial channel of a natural stream. The construction of the dam created a permanent change in the Iowa river. This change in the river and the resulting change in the high-water mark between it and the private property adjoining has existed for more than twice the period necessary to give the State title thereto by prescription, and the new high-water mark created by the construction of the dam becomes the new boundary line.

[¶ 8] This result is supported by the strong public policy favoring movement of the boundary to coincide with the actual course of the river. As this Court explained in *Furlong,* 423 N.W.2d at 140 (footnote omitted):

> Given the development of the Field Code in North Dakota, this conclusion follows logically. The Territorial Legislative Assembly recognized that our state would receive title to the beds of navigable waters at statehood. Accordingly, by 1877, it had enacted a code that would secure title of the state to such lands and modify common law so that the state's title would follow the movement of the bed of the river. This accords with the underlying public policy, since the purpose of a state holding title to a navigable riverbed is to foster the public's right of navigation, traditionally the most important feature of the public trust doctrine. Moreover, it seems to us that other important aspects of the state's public trust interest, such as bathing, swimming, recreation and fishing, as well as irrigation, industrial and other water supplies, are most closely associated with where the water is in the new riverbed, not the old.

Further support for this public policy is found in *Hogue,* 71 N.W.2d at 47:

> Were the rule otherwise, the dominion and control of navigation by the state (subject only to the limitations of the Commerce Clause of the Federal Constitution), would depend on the vagaries of the river, permitting the state control where the river adhered to its course at the time of admission of the State to the Union and denying

the State control where the river, in the process of erosion, subsequently migrated and submerged patented lands. This would lead to absurd and whimsical results.

[¶ 9] The rule urged by Mills would subvert the public's trust interest and could vest title in the state in land that is high and dry, while vesting title to submerged parts of the riverbed in riparian landowners. Whether the cause of the change in the river's condition is natural or artificial, this is the type of "absurd or whimsical" result cautioned against in *Hogue.*

[¶ 10] We conclude the trial court did not err in determining the ordinary high watermark based upon the current condition of the river.

### III

[¶ 11] Mills asserts the evidence does not support the trial court's finding that the ordinary high watermark lies at the embankment at the edge of Riverwood Drive.

[¶ 12] The determination of the ordinary high watermark is a finding of fact, reviewable on appeal under the "clearly erroneous" standard of N.D.R.Civ.P. 52(a). *See United States v. Southern Investment Co.,* 876 F.2d 606, 611 (8th Cir.1989). A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, upon review of the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *E.g., Wachter Development, L.L.C. v. Gomke,* 1998 ND 119, ¶ 9, 579 N.W.2d 209.

[¶ 13] This Court has delineated factors for determining the ordinary high watermark:

" ' "High-water mark" means what its language imports—a water mark. It is coordinate with the limit of the bed of the water; and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes. * * * In some places, however, where the banks are low and flat, the water does not impress on the soil any well-defined line of demarcation between the bed and the banks.

" 'In such cases the effect of the water upon vegetation must be the principal test in determining the location of high-water mark as a line between the riparian owner and the public. It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop.' "

*Devils Lake,* 423 N.W.2d at 144–45 (quoting *Rutten v. State,* 93 N.W.2d 796, 799 (N.D. 1958)).

[¶ 14] The evidence in this record provides ample support for the trial court's finding that the ordinary high watermark lies at the edge of Riverwood Drive. The State presented evidence that there is a well-defined, obvious embankment where the water reaches its highest point, at the western edge of Riverwood Drive. While there is little elevation difference between the disputed land and the flowing river, there is a marked elevation change at the embankment. The State also presented expert testimony that the soil and vegetation change dramatically at that point, with the soil and vegetation on the disputed land demonstrating the aquatic nature of the land.

[¶ 15] We conclude the trial court's finding that the ordinary high watermark lies at the embankment abutting Riverwood Drive is supported by the evidence and is not clearly erroneous.

### IV

[¶ 16] We have considered the remaining issues raised by Mills and find them to be without merit.[1] The judgment is affirmed.

[¶ 17] SANDSTROM, NEUMANN, MARING and KAPSNER, JJ., concur.

---

1. Much of Mills's brief details his assertion his

land has been taken without compensation.

Mills's counterclaim, which alleged a taking and sought damages, was dismissed without preju-dice. We therefore do not decide that issue.