**WILLIS et al. v. UNITED STATES.**

No. 85.

District Court, S. D. West Virginia.

May 14, 1943.

Conley, Thompson & Neff, of Charleston, W. Va., for plaintiffs.

Lemuel R. Via, U. S. Atty., of Huntington, W. Va., Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va., and Thomas L. McKevitt, Atty. Department of Justice, of Washington, D. C., for defendant.

MOORE, District Judge.

The plaintiffs instituted this action on April 5, 1940, to recover compensation for alleged appropriation by the United States of America of a strip of land on the bank of the Great Kanawha River, together with improvements thereon, owned by the plaintiff Willis and under lease for coal mining purposes to the plaintiff Coalburgh-Kanawha Mining Company, and damages to the residue. The action is grounded on the Tucker Act, 28 U.S.C.A. § 41(20).

The War Department, in the year 1934, for the purpose of improving navigation in the Great Kanawha River, erected the Marmet Dam at a point several miles below the Willis property. It was put into operation on May 12, 1934, and the result was a rise in the elevation of the normal pool stage at the Willis property of 12.10 feet. It is necessary in the normal operation of the dam to vary this level from time to time up to the limit of an additional five feet; so that after the dam was put into operation that part of the Willis land lying between elevations 577.90 and 590.0 was permanently submerged, and the land lying between elevations 590.0 and 595.0 was occasionally submerged. The land permanently submerged comprises 3.671 acres, and that occasionally submerged comprises 1.009 acres.

Approximately thirty years prior to the erection of the Marmet Dam the then owner of the Willis land had constructed approximately 2,600 feet of cribbing at the edge of the water for the purpose of protecting the bank against breaking and erosion. This consisted of a log structure filled with rocks. It was six feet wide at the base, four feet wide at the top and about four feet high. At the time the water level was raised by the construction of the Marmet Dam, the logs had virtually disappeared, having rotted and worn away; but the rocks had become imbedded in the soil and vegetation so as to form a permanent part of the river bank, and so as to constitute a shield and protection against the natural erosive action of the waters of the stream. There was also located on the Willis land a combination rail and river tipple. That part which served as a river tipple was built upon a foundation which extended out well into the bed of the stream.

The Marmet Dam was not the first dam to be erected in the Great Kanawha River below the Willis land. In the year 1880 the river was improved by a series of locks and dams of which one, known as Lock Four, was built a short distance below the Willis land, and caused a rise in the normal pool stage of the river at the Willis land of approximately three and one-half to four feet above the normal stage which existed before any dams were built.

The United States of America did not institute any proceeding for the condemnation of the Willis land; the theory of its counsel being, as shown in this litigation, that the land flooded as the result of the construction of the Marmet Dam was below the ordinary high water mark, and therefore subject to be taken by the United States without compensation for the purpose of improving navigation.

The disputed questions of fact in this case are:

(1) Did the construction of the Marmet Dam cause a rise in the water level at the Willis land above the ordinary high water mark; or, to express it in another way, was land flooded which was not already in the bed of the river?

(2) If the plaintiff is entitled to damages, what is the amount of damage?

"The dominant power of the Federal Government, as has been repeatedly held, extends to the entire bed of a stream." United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 775, 85 L.Ed. 1064. In the early case of Alabama v. Georgia, 23 How. 505, 515, 16 L.Ed. 556, the bed of a river is defined as "that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn." Is this definition inconsistent with the statement in the case first cited above to the effect that the river bed includes all land below the ordinary high water mark? I think not.

Rivers such as the Great Kanawha, fed as they are by mountain streams and springs, become in their navigable reaches fairly constant in respect of water level. They do not run dry, although in seasons of great drought they may for a time noticeably decrease in volume. They are subject to floods, but these occur only during brief periods of heavy rainfall. The ordinary day to day or week to week fluctua-

tions in the level of the water take place within a comparatively narrow belt of the shore line, which may vary in width according to the nature of the stream but which, as to each particular stream, is ascertainable from traces left on the shore by the action of the water. A flood may leave traces in the form of bent and muddy vegetation and of weeds, dead branches and silt caught in the tops of high trees; but these soon disappear. No permanent mark is left. Land that has been flooded soon becomes again tillable, often improved rather than damaged. It is otherwise as to the land at the river's edge. Here the constant presence and action of the water causes a definite change in the character of the soil. The highest point at which such a change is observable is the *ordinary* high water *mark*. Counsel for the Government contend that the proper and scientific method of fixing the location of ordinary high water mark consists in analyzing the official records of river stages over a period of years (in this case the records of fifty years were used) and adopting as the ordinary high water mark the level which was reached by the water at least once in each of these years. More than one fallacy is inherent in this argument. Why adopt as a standard of frequency the arbitrary figure of once a year? Why not twice a year, or three times? And why analyze the records of fifty years rather than one hundred years, or twenty-five? It is obvious that such a method of analysis must produce a result which will vary according to the period of time and frequency of occurrence arbitrarily selected by the individual analyst. Such a method, while it may be useful for the purpose of deciding engineering problems, is utterly unreliable as a means of determining the respective rights of the United States and the riparian property owner.

The obvious result of applying the method advocated by counsel for the Government would be to subject the property owner to the risk of permanent flood conditions; to require him to submit without compensation to a condition during every day in the year which in the ordinary course of nature occurs on but one day in the year. The right of the United States can not be so extended.

The evidence in this case shows that before the construction of any locks or dams in the Great Kanawha River there was a well defined ordinary high water mark along the shore which extended no higher than three or four feet above the normal stage of the river. The construction of the first dam, in the year 1880, had the effect of raising the normal pool stage approximately to the level of the original high water mark.

I therefore conclude that the ordinary high water mark of the Great Kanawha River at the Willis land, for the purpose of determining the owner's right to compensation, must be fixed at a point no higher than the normal pool stage prior to May 12, 1934, which, according to stipulation filed, was at the elevation 577.90. The plaintiff is entitled to compensation for all the land and improvements taken above that level.

It is shown that the cribbing which has now been submerged was built on land which was above ordinary high water mark, with the possible exception of trivial portions thereof which may have extended slightly below that level. The land owner therefore is entitled to compensation for any damages to his land resulting from the submergence of the cribbing.

That portion of plaintiff's land between elevation 590.0 and 595.0 has not been taken in its entirety by the Government. Only occasionally will the normal operation of the Marmet Dam cause this additional five feet to be flooded. Therefore, the property owner may recover in this proceeding, with reference to that part of his land, only the reasonable value of an easement to the extent indicated.

The evidence is conflicting as to the fair market value of the land taken. I am of opinion from all the evidence that the land was worth in May, 1934, $1,000 per acre, not considering the value of the cribbing. I am further of opinion that the property owner is damaged by the easement acquired by the Government in the land between the 590.0 and 595.0 levels to the extent of one-half the value of this land. I find therefore that he is entitled to the sum of $3,671 for land taken, exclusive of the damage caused by taking the cribbing, and $504.50 for the land which is subject to the easement. These values, amounting to $4,175.50, should be augmented by interest which, at the time suit was brought, amounted to $1,478.80, or a total of $5,654.30. If this were the only item of damage it would amount with interest to the date of this opinion to the sum of $6,430.27; but I am allowing damages also for the taking of the cribbing, and since the amount found as the value of

the land taken in whole and in part, together with interest thereon to the date the action was brought, plus the amount hereinafter found as damages for the taking of the cribbing, with interest, amount to more than the $10,000 sued for, this jurisdictional amount limits the total recovery herein.

With reference to the damage caused by the taking of the cribbing, the evidence shows and I so find that the cribbing as it existed at the time of the taking was of material value in protecting the river bank against erosion and washing away. It is further shown that during the nine years which have elapsed since the dam was put into operation considerable damage has been done to the river bank by the action of the water which would not have occurred if the bank were protected by cribbing similar to that which was inundated. There was some testimony on the part of the Government to the effect that the river bank has now reached an "angle of repose," but this was contradicted, and the charts introduced in evidence showing cross sections of the river bank do not bear out the contention that an "angle of repose" has been reached. Witnesses for the plaintiffs testified that, in view of the improvements on the land near the edge of the bank and the likelihood of their foundations being made insecure by reason of slips and breaks of earth caused by action of the water, protection of the bank by means of cribbing would be sound economy even at a cost as high as $5 per running foot.

While it is true that the original cribbing, insofar as the timbers are concerned, had completely rotted away and disappeared, yet that part of it which remained as a permanent improvement to the land was of **substantial value** and might be reasonably

expected to serve indefinitely the purpose for which it was intended. I am of opinion and so find that the damage to the land owner due to the taking of the cribbing, which was submerged and rendered useless by the raising of the water level, was an amount which, with interest from May 12, 1934, to April 5, 1940, was substantially in excess of the difference between the sum of $5,654.30 and the sum of $10,000 sued for.

■ I find no damages by reason of alleged expenses incurred in repairing and remodeling the river tipple, because this structure was based in the bed of the stream and damages to it are therefore not compensable.

■ Counsel for the Government contend that the land was specially benefitted by the improvement of the river, and that the value of such special benefits should be offset against the damages, if any, caused by the rise in the level of the water. As to this question, the burden was on the Government to prove the special benefits alleged. It has not sustained this burden. I do not find from the evidence that any substantial special benefits resulted.

In the pre-trial order it was stipulated that plaintiff John A. Willis was at the time of the taking and is now the owner in fee simple of the land and improvements under consideration in this case. It appears therefore that the co-plaintiff, Coalburgh-Kanawha Mining Company, has no interest in the judgment herein awarded.

An order may be entered awarding judgment to the plaintiff John A. Willis in the amount of $10,000 with interest thereon from April 5, 1940, to the date of payment.