[Civ. No. 25115. Third Dist. Nov. 24, 1986.]

CHARLES F. FOGERTY et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

226

228

## Counsel

William T. Chidlaw, Peter E. Racobs, Washburn & Kemp, Edgar B. Washburn and John P. Yeager for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Jan Stevens and David B. Judson, Deputy Attorneys General for Defendants and Respondents.

## Opinion

SIMS, J.—In *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239] (hereafter *Lyon*) our Supreme Court

held that the lands lying between the low and high watermarks of Clear Lake are owned by their littoral owners subject to a "trust" interest held by the State of California for the benefit of the public for purposes of commerce, navigation, fishing, recreation, and preservation of the land in its natural state. (*Id.,* at pp. 226-233.) In *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240 [172 Cal.Rptr. 713, 625 P.2d 256] (hereafter *Fogerty*) our high court held, in this very case, that the public trust enunciated in *Lyon* was applicable to Lake Tahoe. (*Id.,* at pp. 243, 247.) In this appeal, we hold that, for purposes of determining the boundaries of land along the shore of Lake Tahoe subject to the public trust, the low watermark of the lake is 6,223 feet above sea level, Lake Tahoe datum, and the high watermark is 6,228.75 feet above sea level, Lake Tahoe datum.

PROCEDURAL BACKGROUND

This litigation began in 1977 when the Attorney General informed the State Lands Commission that the state claimed fee ownership of the shorezone, the property lying between the low and high watermarks of navigable nontidal lakes and rivers. (*Fogerty, supra,* 29 Cal.3d at p. 243.) The Commission proposed to record claims to such lands in county recorders' offices throughout the state. (*Ibid.*) Thereupon, plaintiffs Charles and Stella Fogerty and other owners of property along the shores of Lake Tahoe, and Tahoe Shorezone Representation, a corporation which represents many shorezone owners, filed this litigation claiming they and not the state owned the lands between low and high waters. (*Ibid.*) In *Lyon* our Supreme Court resolved this question, concluding private citizens held fee title to the lands to the low watermark. (*Lyon, supra,* 29 Cal.3d at p. 226.) The court went on to hold, however, that the land between low and high water was subject to the public trust. (*Id.,* at pp. 226-233.)

The court first determined that California acquired sovereign fee ownership of the lands between low and high water in nontidal navigable lakes and rivers upon its admission to the Union. (*Lyon, supra,* at pp. 217-222.) The court next determined that, by the enactment of Civil Code section 830 in 1872, the Legislature granted fee title to the lands in question to the littoral property owners.[1] (*Id.,* at pp. 222-226.) Finally, the court considered whether the grant of fee title was free of the public trust described in *City of Berkeley* v. *Superior Court* (1980) 26. Cal.3d 515 [162 Cal.Rptr. 327, 606 P.2d 362]. The court concluded it was not, and that the trust still

---

[1]Civil Code section 830 provides that "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide-water, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

applied, relying on the settled proposition that lands held by the state in trust remain subject to the trust once conveyed to private parties unless the conveyance was made for trust purposes. (*Lyon, supra,* at pp. 226-232.)

In *Fogerty,* the People sought a writ of mandate from our Supreme Court after the trial court had entered partial summary judgment decreeing that no real property lying landward of the last *natural* low watermark of Lake Tahoe was subject to the public trust. (29 Cal.3d at p. 243.) The court addressed two questions not discussed in *Lyon.*

First, the court concluded the People may not be estopped from asserting their public trust interest in those lands lying between low and high watermarks: "The exercise of the police power has proved insufficient to protect the shorezone. The urgent need to prevent deterioration and disappearance of this fragile resource provides ample justification for our conclusion that the People may not be estopped from asserting the rights of the public in those lands." (*Fogerty, supra,* 29 Cal.3d at p. 247.)

Second, the court concluded the boundary between public and private ownership was to be measured by using the "current" level of the lake. (*Id.,* at pp. 248-249.) Although Lake Tahoe had existed before statehood, its elevation was raised significantly by the construction of a dam across its natural outlet into the Truckee River in 1870. (*Fogerty, supra,* 29 Cal.3d at p. 247.) Lands were inundated which, before statehood, had belonged to the littoral owners free of the public trust. The court therefore faced the question whether these newly flooded lands remained free of the trust or had become subject to it. (*Ibid.*)

The court began by noting with approval the People's contention that it would be difficult if not impossible to reconstruct the natural water levels of a lake. (*Id.,* at p. 248.) The court reasoned that "The monumental evidentiary problem which would be created by measuring the boundary line between public and private ownership in accordance with the water level which existed prior to the construction of [the dam] provides a convincing justification for accepting *the current level of the lake* as the appropriate standard." (*Ibid.,* italics added.)

The court went on to note, "Moreover, the dam at Lake Tahoe has been in existence since 1870, long past the period required for the acquisition of prescriptive rights by the state in the lands in question. (Civ. Code, § 1007; Code Civ. Proc., § 325.) It has been held in other jurisdictions that a landowner loses ownership of property covered by water resulting from the construction of a dam if the condition has continued for the period required for the acquisition of prescriptive rights. (*State* v. *Parker* (1918)

132 Ark. 316 [200 S.W. 1014, 1016]; *State* v. *Sorenson* (1937) 222 Iowa 1248 [271 N.W. 234, 238-239].) *Sorenson* stated that in these circumstances 'the artificial condition is . . . stamped with the character of a natural condition, and the title to the lands covered by the waters of the lake is deemed to have passed from private ownership to the same trust as that of lands covered by the waters of natural navigable lakes. The state, and private owners, as well, of lands affected by the artificial condition, may enforce the maintenance of that condition.'" (*Fogerty, supra,* 29 Cal.3d at pp. 248-249.) Thus, the court held the trial court had erred in using the pre-dam level of the lake to set the low watermark. (*Id.,* at p. 249.)

The *Fogerty* court issued a writ of mandate directing the trial court (a) to vacate its order granting the landowners' motion for partial summary judgment and (b) to grant the People's motion for partial summary judgment and partial judgment on the pleadings "insofar as consistent with the views expressed above." (*Ibid.*)

In *Lyon,* the court added a footnote referring to *Fogerty* and directing "that the determination of the boundary between public and private ownership must be assessed in accordance with the shoreline of the lake as it exists presently." (*Lyon, supra,* 29 Cal.3d at p. 232, fn. 20.) The *Lyon* court issued a writ identical to that in *Fogerty.* (*Id.,* at p. 233.)

Following our Supreme Court's issuance of its writ to the trial court in this case, the state moved for summary judgment. The state submitted voluminous exhibits in support of its motion which established, among other things, that several agencies of government including the U.S. Army Corps of Engineers, the California Tahoe Regional Planning Agency and the bistate Tahoe Regional Planning Agency have consistently used the figure of 6,229.1 feet above sea level as the lake's high watermark. That figure had its genesis with the California-Nevada Interstate Compact Commission in 1934 and was premised on the volume of water needed by users along the Truckee River. It was incorporated in the Truckee River Agreement of 1935 which was negotiated by the United States and several major users of Truckee River water. (See generally 30 Ops.Cal.Atty.Gen. 262 (1957).) It was also incorporated in a consent decree which adjudicated the water rights of all users of Truckee River water. (*U.S.* v. *Orr Water Ditch Co.* (D. Nev. 1944) Equity No. A3.) However, the littoral property owners were never made parties to the negotiations or the litigation. (30 Ops.Cal.Atty.Gen., *supra,* at p. 268.)

Defendants' exhibit R showed the maximum and minimum lake elevations from 1900 to 1984. The exhibit revealed that since 1917 the lake had never

reached its negotiated high watermark of 6,229.1 feet.[2] The data summarized in the exhibit are undisputed by the parties.

The trial court entered summary judgment in favor of the state establishing among other things that: (1) the lake's *high* watermark, as well as its low watermark, is to be determined in accordance with the lake's current conditions; and (2) the high watermark of Lake Tahoe constituting the uppermost limit of the lake subject to the public trust is located at 6,229.1 feet above sea level, Lake Tahoe datum.[3]

Plaintiffs' appeal challenges these two rulings. As we shall explain, we conclude many of plaintiffs' contentions are foreclosed by *Lyon* and *Fogerty*. However, plaintiffs also assert the trial court erroneously fixed the high watermark at a theoretical maximum elevation which the lake has not reached since 1917. This contention is meritorious; we shall modify the trial court's summary judgment to reflect the high watermark as disclosed by the record in accordance with the state's acquisition of its property interest by prescription.

 Plaintiffs have acquiesced in the summary judgment's establishment of 6,223 feet as the lake's low watermark and do not challenge that figure on appeal. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 479, p. 469.) Defendants have not cross-appealed (see *op. cit. supra,* at pp. 394-395) and may make no challenge of their own. Accordingly, the figure of

---

[2]However, it had come close on several occasions. Since the entry of the consent decree in 1944 (which established the present mode of water level regulation) the lake exceeded elevation 6,229 feet on a total of 81 days. During that time, however, it never rose the next one-tenth of a foot to the theoretical maximum of 6,229.1 feet.

[3]The trial court's judgment established the following:

"1. Plaintiff landowners holding otherwise valid grants to the shores of Lake Tahoe hold to the low water mark thereof;

"2. The title of littoral owners at Lake Tahoe is impressed with a public trust for commerce, navigation, fisheries and environmental preservation to the high water mark thereof;

"3. The state may not be estopped from asserting the rights of the public to the high water mark at Lake Tahoe;

"4. The high and low water marks at Lake Tahoe are to be determined in accordance with the current condition of that lake;

"5. The low water mark constituting the fee boundary between [the bed of Lake Tahoe in] state sovereign ownership and upland fee ownership is located at 6,223 feet above sea level, Lake Tahoe datum;

"6. The high water mark of Lake Tahoe constituting the uppermost limit of that lake subject to the public trust is located at 6,229.1 feet above sea level, Lake Tahoe datum;

"7. Any right of the plaintiffs herein to pier out to the line of navigation in Lake Tahoe is subject to the authority of the State of California and its designees to impose reasonable regulations;

"8. Plaintiffs holding property littoral to the bed of Lake Tahoe have not been deprived of the use or enjoyment thereof without compensation, contrary to the provisions of article 1, section 19 of the state Constitution and amendments V and XIV of the United States Constitution."

6,223 feet as the low watermark is conclusively established. Consequently, as modified to reflect the correct high watermark, the judgment shall be affirmed.

DISCUSSION

I

*Certain of Plaintiffs' Contentions Cannot be Reconciled with Lyon and Fogerty.*

■ Read together, we think *Lyon* and *Fogerty* establish the following rules: (1) the littoral property owners own the shorezone[4] of Lake Tahoe in fee simple to the low watermark of the lake in its "current" condition; (2) the property owners' fee simple title in the shorezone is impressed with a public trust analogous to an easement, acquired by the State of California pursuant to the doctrine of prescription and held for the benefit of the public for purposes of commerce, navigation, fishing, recreation and preservation of the land in its natural state.

In their attack on the judgment, plaintiffs have fired a fusillade of contentions that essentially ask us to undo what *Lyon* and *Fogerty* have done.[5] ■ Thus, for example, although plaintiffs concede in their brief that "*Lyon* held that the public trust easement extends to the ordinary high watermark, making it necessary to ascertain the location of that line," plaintiffs contend the high watermark must be set according to conditions prevailing in 1850, when California was admitted to the Union.

This argument cannot be reconciled with *Fogerty*'s conclusion the state has acquired prescriptive rights by the incursion of higher water caused by construction of the dam. (29 Cal.3d at pp. 248-249.) The argument also asks us to disregard *Fogerty*'s instruction that the low watermark must be set according to the "current" level of the lake. (*Id.*, at p. 248.) Plainly if the shorezone must be established, and if the lower boundary of that zone must be set by using the "current" level of the lake after construction of a dam, then the upper boundary cannot be set using the pre-dam level. That formula would theoretically allow the upper boundary of the shorezone to

---

[4]The lands between low and high water. (*Fogerty, supra,* 29 Cal.3d at p. 245.)

[5]These include the assertions: (1) that our Supreme Court's decisions in *Lyon* and *Fogerty* constitute a "sudden and unpredictable change in state law" and thereby violate their constitutional rights to due process of law; (2) that the state acquired no prescriptive rights in new shorezone created by construction of the dam; and (3) that any prescriptive rights acquired by the state permit fewer uses of land by the public than the uses allowed by the public trust doctrine.

be set at an elevation lower than the lower boundary, so the shorezone would always be under water.[6] That result would effectively remove all shore from the shorezone. Such a result cannot be reconciled with *Fogerty*'s extensive discussion of the shorezone as "*land* between high and low water" necessary for the survival of birds, plants, and vegetation and useful for picnicking, hunting and biking. (*Fogerty, supra,* 29 Cal.3d at p. 245, italics added.)

■ As an inferior court, we are dutybound to follow and apply the law as interpreted by our Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) ■ Plaintiffs suggest the Supreme Court's express instructions—to set the low watermark using post-dam conditions—are dicta and may be disregarded by this court. We cannot agree. Even when part of an opinion is not relevant to material facts, if it is responsive to an argument raised by counsel and intended for guidance of the court and attorneys upon a new hearing, it probably constitutes the basis of the decision and cannot be disregarded by a lower court as mere dictum. (*United Steelworkers of America* v. *Board of Education* (1984) 162 Cal.App.3d 823, 834-835 [209 Cal.Rptr. 16]; *Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450, 460 [290 P.2d 617].) Here, in both *Lyon* and *Fogerty,* the Supreme Court issued writs directing lower courts to rule "consistent with the views expressed above." (*Lyon, supra,* at p. 233; *Fogerty, supra,* at p. 249.) In these circumstances, *Fogerty*'s direction to use the "current" post-dam level of the lake is not dictum.[7] (*United Steelworkers of America* v. *Board of Education, supra,* 162 Cal.App.3d at p. 835.) Indeed, the court's remarks on the question constitute the law of the case that we are obliged to follow. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211]; compare *Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 [212 Cal.Rptr. 466, 696 P.2d 1308].) ■ We shall therefore use the "current" condition of the lake to set the high watermark.

II

*The "Current" Level of Lake Tahoe is 6,228.75 Feet Above Sea Level, Lake Tahoe Datum.*

Plaintiffs contend the trial court erred in setting the high level of the lake at 6,229.1 feet above sea level. For reasons that follow, we agree.

---

[6]It is immaterial that the lower boundary now established—6,223 feet—may or may not be lower than the high level of the lake in 1850. That figure had not been agreed upon and was not discussed by the court in *Fogerty.*

[7]Even assuming it is dictum, we would be bound to follow it. (See *County of Fresno* v. *Superior Court* (1978) 82 Cal.App.3d 191, 194 [146 Cal.Rptr. 880].)

A. *The 1944 consent decree adjudicating water rights of all users of Truckee River water does not establish the high watermark of Lake Tahoe for public trust purposes.*

In a consent decree entered into in 1944, the level of Lake Tahoe was set at 6,229.1 feet for purposes of adjudicating the water rights of all users of Truckee River water. (*U.S. v. Orr Water Ditch Co., supra,* Equity No. A3.) The Attorney General now argues the consent decree may be used to set the high level of the lake in this case. However, in 1957 the California Attorney General opined the consent decree could have no effect on the property rights of littoral property owners because they were not parties to the litigation. (30 Ops.Cal.Atty.Gen., *supra,* at p. 268.) We think the Attorney General had it right in 1957. The party against whom the plea of collateral estoppel or res judicata is asserted must have been a party or otherwise privy to the prior action. (*F. W. Woolworth Co.* v. *Franchise Tax Bd.* (1984) 160 Cal.App.3d 1154, 1160 [207 Cal.Rptr. 149].) Since such was not the case here, the consent decree has no effect on plaintiff's property rights.[8]

B. *The state did not acquire any property rights by plaintiffs' "acquiescence" in public administrative agencies' use of 6,229.1 feet above sea level as the high level of the lake.*

As we have noted, the level of Lake Tahoe has never reached elevation 6,229.1 feet since 1917. Nonetheless, the defendants note that correspondence and records maintained by the State Lands Commission reveal a widespread acceptance of 6,229.1 feet as the lake's high watermark. Defendants also point to an affidavit by plaintiffs' counsel suggesting that the figure of 6,229 feet is "generally accepted" as the high watermark. In addition, defendants note that the U.S. Army Corps of Engineers, the California Tahoe Regional Planning Agency and the bistate Tahoe Regional Planning Agency have consistently used that figure. Defendants conclude the widespread acceptance of the figure (6,229.1 feet) compels the conclusion the figure has been established by "acquiescence" and is now binding on plaintiffs. We cannot agree.

We note, first of all, that in *Fogerty* our Supreme Court neither stated nor implied that it was of the view the littoral owners' land had been impressed with the public trust under a novel theory of "acquiescence." We do not read *Fogerty* as establishing some new theory by which the state acquires rights in private property. Indeed, what the court said in *Fogerty* was precisely the opposite—that the state's rights were obtained under the

---

[8]We also note the consent decree litigated water rights, not property rights.

long-established doctrine of prescription. The state's proposed theory of "acquiescence" is therefore not "consistent with the views expressed" in *Fogerty,* as that case directs. (29 Cal.3d at p. 233.)

Moreover, if defendants' claim of "acquiescence" has any grounding in an established theory of property rights, it may be viewed as an assertion of an "agreed boundary." However, the assertion may not be maintained. The doctrine of agreed boundary is wholly insufficient to sustain the trial court's high watermark of 6,229.1 feet.

■ The elements required to establish an agreed boundary are well established. They are: (1) uncertainty as to the true boundary line; (2) an express or implied agreement between adjoining landowners to accept a line as the boundary; and (3) acceptance and acquiescence in the line for a period equal to the statute of limitations or until action is taken in reliance on the agreement which would result in substantial loss if the boundary were altered. (*French* v. *Brinkman* (1963) 60 Cal.2d 547, 551 [35 Cal.Rptr. 289, 387 P.2d 1]; *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707-709 [336 P.2d 525]; see *Humphrey* v. *Futter* (1985) 169 Cal.App.3d 333, 338 [215 Cal.Rptr. 178]; *Finley* v. *Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 699 [160 Cal.Rptr. 423]; 3 Miller & Starr, Cal. Real Estate (rev. ed. 1977) § 21:27, pp. 552-559.)

■ The objects of the agreed boundary doctrine are to secure repose, to prevent strife and disputes concerning boundaries, and make titles permanent and stable. (*Martin* v. *Lopes* (1946) 28 Cal.2d 618, 623 [170 P.2d 881]; 3 Miller & Starr, *op. cit. supra,* § 21:27, pp. 553-554.) The policy of the law is to give stability to agreements which the parties themselves undertake in good faith in an effort to settle an extant controversy. (*Martin* v. *Lopes, supra,* at p. 624.)

■ Where an extant controversy is absent the doctrine may not be applied. For example, the mere erection of a fence at a certain point does not establish a boundary if there is no dispute which the construction of the fence purports to resolve. (See *Dooley's Hardware Mart* v. *Trigg* (1969) 270 Cal.App.2d 337, 340 [75 Cal.Rptr. 745].) Although the existence of a dispute may be inferred from long standing acceptance of a fence as a boundary (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at p. 708), where there is direct evidence that no controversy existed the doctrine of agreed boundaries is inapposite. (*Dooley's Hardware Mart* v. *Trigg, supra,* 270 Cal.App.2d at pp. 340-341; 3 Miller & Starr, *op. cit. supra,* § 21:31, p. 562.)

Here, the agreed boundary doctrine is inapplicable because, at the time the figure of 6,229.1 feet was established as a limitation on filling Lake

Tahoe, and until recently, there was no extant controversy as to the boundary of public property rights, so no controversy was resolved. We know this, as a matter of law, because "with few exceptions, state authorities, including the Attorney General, took the position until at least 1970 that by virtue of the provisions of [Civil Code] section 830 the state claimed ownership only to the low water mark. [Citations.]" (*Lyon, supra,* at p. 224.) The state first asserted claim to the lands at Lake Tahoe in 1977, whereupon this litigation was promptly filed. (*Fogerty, supra,* at p. 243.) Before the state's assertion of its claim in 1977, the owners had no reason to believe the figure of 6,229.1 feet was anything more than a limitation on filling the reservoir. They had no cause to suspect it could have further significance as a property boundary for purposes of the public trust doctrine. The owners had no more reason to believe their property rights were being adjusted under the agreed boundary doctrine (by their acquiescence in a theoretical lake level of 6,229.1 feet) than would the property owner who watches his neighbor build a fence on the neighbor's own land in order to comply with an ordinance requiring the construction of fences. (See *Dooley's Hardware Mart* v. *Trigg, supra,* 270 Cal.App.2d at pp. 339-340.) Thus, there was no controversy over property boundaries to be resolved by agreement. (*Id.,* at pp. 340-341.)

In the circumstances it would be manifestly unfair, if not disingenuous, to justify the imposition of public trust rights upon private owners' land on the basis that the owners, by their ignorance and inaction, somehow "agreed" to imposition of the public trust boundary at elevation 6,229.1 feet. The trial court's high watermark may not be sustained under a theory of "agreed boundary."

C. *The extent of the public trust must be established in accordance with a theory of prescriptive rights.*

1. *The doctrine of prescription will not support a high watermark of 6,229.1 feet.*

As we have noted, we read *Fogerty* as establishing that the People have acquired their public trust rights in the shorezone by prescription. ■■ ■■ ■■ Although the public trust may not be in all respects identical to an easement,[9] we think the similarities are sufficient to justify resort to the law of prescriptive easements to set the upper boundary of the public trust. (See, e.g., *Gilardi* v. *Hallam* (1981) 30 Cal.3d 317, [178 Cal.Rptr. 624,

---

[9]Thus, for example, *Lyon* apparently establishes that the uses of land subject to the public trust are broader than actual uses of the land previously by the public. (See *Lyon, supra,* 29 Cal.3d at p. 229.)

636 P.2d 588] *Gion* v. *City of Santa Cruz* (1970) 2 Cal.3d 29, 41 [84 Cal.Rptr. 162, 465 P.2d 50].)

■ Defendants contend a high watermark of 6,229.1 feet has been established by prescription. However, we cannot agree.

■ "The elements necessary to establish a prescriptive easement are well settled. The party claiming such an easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years." (*Warsaw* v. *Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570 [199 Cal.Rptr. 773, 676 P.2d 584]; Code Civ. Proc., § 321.) The purpose of these requirements is to insure that the owner of the real property which is being encroached upon has actual or constructive notice of the adverse use and to provide sufficient time to take necessary action to prevent that adverse use from ripening into a prescriptive easement. (*Twin Peaks Land Co.* v. *Briggs* (1982) 130 Cal.App.3d 587, 593 [181 Cal.Rptr. 25]; *Zimmer* v. *Dykstra* (1974) 39 Cal.App.3d 422, 431 [114 Cal.Rptr. 380].)

■ Unlike waters which actually lap upon the shore, a high watermark which exists only on paper and not on the land is not a "use" of the land at all, much less an "open" one. (See *Warsaw* v. *Chicago Metallic Ceilings, supra,* 35 Cal.3d at p. 570.) A "paper" high watermark—particularly one unaccompanied by the assertion of any effect on property rights—cannot fulfill the notice purpose underlying the elements of prescription. (*Twin Peaks Land Co.* v. *Briggs, supra,* 130 Cal.App.3d at p. 593; *Zimmer* v. *Dykstra, supra,* 39 Cal.App.3d at p. 431.) As the Court of Appeal has colorfully said, an adverse user "'"must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest."'" (*Wood* v. *Davidson* (1944) 62 Cal.App.2d 885, 890 [145 P.2d 659].) To continue the metaphor, merely filing the blueprints for a flagpole over at the irrigation district offices or at the federal courthouse with the thought that, someday, the flagpole might be built, is not the sort of notice to which the landowner is entitled. The trial court erred in concluding that 6,229.1 feet was the high watermark.

2. *Application of the doctrine of prescription results in a high watermark of 6,228.75 feet above sea level.*

*Fogerty*'s doctrine of prescriptive rights is derived from cases allowing the public to obtain property rights from the actual incursion of dam waters upon the shore. (See *Fogerty, supra,* 29 Cal.3d at p. 248; *State* v. *Parker* (1918) 132 Ark. 316 [200 S.W. 1014, 1016]; *State* v. *Sorenson* (1937) 222

Iowa 1248 [271 N.W. 234, 238-239].) ▬ We shall therefore use the actual incursion of the waters to set the high level of Lake Tahoe. The question is: what is the appropriate level of actual incursion? Once again, we turn to the law of prescriptive easements for the answer.

"To acquire a prescriptive easement, the easement must be used in the required manner continuously and without interruption for the full prescriptive period [of five years]. The actual use required depends on the nature of the easement. It need not be used every day during the prescriptive period. The use is sufficient if it occurs on those occasions when it is necessary for the convenience of the user." (3 Miller & Starr, *op. cit. supra,* § 18:37, pp. 327-328.) "If a right of way over another's land has been used for more than five years, it is not necessary, to make good such use, that the claimant has used it every day. He uses it every day, or once in every week, or twice a month, as his needs require. He is not required to go over it when he does not need it, to make his use of the way continuous. The claimant is required to make such reasonable use of the way as his needs require." (*Hesperia Land etc. Co.* v. *Rogers* (1890) 83 Cal. 10, 11 [23 P. 196].)

In *Hesperia Land* our Supreme Court held that a user of a water ditch need not use the ditch year-round in order to satisfy the requirement of continuous use. It was sufficient that he used the ditch during the growing season and then only when he needed it. (*Ibid.*; see *Twin Peaks Land Co.* v. *Briggs, supra,* 130 Cal.App.3d at p. 593.)

We find *Hesperia Land* directly analogous to the situation at bar. The need for water storage, like the need for water transportation in an irrigation ditch, fluctuates from season to season and ultimately from year to year. We believe it wholly unnecessary to the doctrine of prescription for water impounded behind a dam to remain in place continuously for the five-year period in order for prescriptive rights to attach. Practical experience tells us no reservoir operates that way. We believe, instead, that the needs of the reservoir operator are determinative. (*Hesperia Land etc. Co.* v. *Rogers, supra,* 83 Cal. at p. 11.) Where the reservoir operator returns the waters to a zenith each water year and maintains the water at that elevation for the duration of his needs his use of the reservoir is "continuous" up to and including that highest point. (*Ibid.*) For purposes of the public trust doctrine, we shall therefore set the high watermark of Lake Tahoe at the highest elevation actually reached by the "current" lake in five sequential years.

Applying this rule to the undisputed data contained in defendants' exhibit R is relatively straightforward. We must look to the lake's current conditions. (*Fogerty, supra,* 29 Cal.3d at pp. 248-249.) Thus, we consider the water levels after 1944 when the present mode of water level regulation was

established. Examining defendants' exhibit R, we find that the five consecutive years of highest water since 1944 are years 1967, 1968, 1969, 1970, and 1971. In each of those five years, the lake has reached elevation 6,228.75 feet.[10] This is a "continuous" use of the reservoir up to that elevation for the purposes of prescriptive rights. (*Hesperia Land etc. Co.* v. *Rogers, supra,* 83 Cal. at p. 11.)

We acknowledge that the high watermark should be "ordinary" and should not represent the level reached by water in unusual floods. (*Lyon, supra,* 29 Cal.3d at p. 216; *State* v. *Sorenson, supra,* 271 N.W. at p. 236.) The undisputed data indicate the figure of 6,228.75 feet is not markedly different from other elevations of the lake reached since 1944 and does not represent an inappropriate unusual condition of the lake.[11] ▆▆▆▆ We shall modify the trial court's judgment to establish the high watermark as 6,228.75 feet above sea level, Lake Tahoe datum.[12]

---

[10]The actual water levels were as follows:

1967 . . . . . . . . . . 6,228.87 feet
1968 . . . . . . . . . . 6,228.75 feet
1969 . . . . . . . . . . 6,229.05 feet
1970 . . . . . . . . . . 6,229.05 feet
1971 . . . . . . . . . . 6,228.99 feet

Needless to say, only the lowest of these five elevations has been reached *each* year.

Because the last year of the prescriptive period was 1971 we need not consider the effect, if any, of Civil Code section 1009 (effective 1972) which provides a means of protecting owners of private property who make their lands available to the public from later claims of prescriptive rights.

[11]For example, in years 1951, 1952, and 1953 the lake reached elevations 6,228.89, 6,228.79, and 6,229.04 feet, respectively. Similarly, in years 1956, 1957, and 1958, the lake reached elevations 6,229.04, 6,229.07, and 6,229.02 feet, respectively. In 1973, 1974, and 1975, the lake reached 6,228.64, 6,228.92, and 6,228.64 feet, and in 1982, 1983, and 1984 the lake exceeded elevation 6,228.50 feet.

[12]The parties have suggested various other methods that might be used to set the high level of the lake. However, none of the methods they suggest is consistent with the theory of prescriptive rights which provides the basis for the state's assertion of its public trust. (*Fogerty,* 29 Cal.3d at pp. 248-249.) We briefly summarize the proposed methods and their shortcomings.

The traditional method of ascertaining the high watermark in tidal waters is of little help. The height of the tides is determined primarily by the gravitational effects of the sun and the moon; these effects run one complete cycle every 18.6 years. The high tide is generally computed by averaging the high tides occurring over such a period of time. (*Borax Consolidated* v. *City of Los Angeles* (1935) 296 U.S. 10, 26-27 [80 L.Ed. 9, 20, 56 S.Ct. 23].) This method is inconsistent with prescriptive rights obtained during a five-year period of time. Moreover, nontidal waters generally, and waters impounded behind a dam in particular, know of no tidal rhythmic regularity. Water stored in reservoirs, like that in uncontrolled lakes and streams, fluctuates with the weather but is also under the direct control of man. Thus, the 18.6-year average is of little utility.

Averaging the high watermarks set over a larger number of years is also inconsistent with the theory of prescriptive rights. Moreover, the method poses two additional problems: (1) determining the number of years over which to average (see, e.g., *Willis* v. *United States* (S.D.W.Va. 1943) 50 F.Supp. 99, 101-102; and (2) the danger that a landowner may have

## DISPOSITION

The judgment is modified to reflect that "the high watermark of Lake Tahoe constituting the uppermost limit of that lake subject to the public trust is located at 6,228.75 feet above sea level, Lake Tahoe datum." As modified, the judgment is affirmed.

Blease, Acting P. J., and Carr, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 4, 1987.

---

to endure excess encroachment in years of above-average waters.

 Plaintiffs propose the method traditionally used in free-flowing rivers. The high watermark is defined as the place where the riverbed ends and the riverbank begins. (*Howard* v. *Ingersoll* (1851) 54 U.S. 381 [14 L.Ed. 189].) This method involves examining the riverbank to find the highest point where the water's flows have prevented the growth of vegetation. (See *Harrison* v. *Fite* (8th Cir. 1906) 148 F. 781, 783.) This method is premised on the assumption that the river will, over a period of time, predictably return to a certain level where it will leave an indelible mark upon its banks. This method is unacceptable for several reasons. First, resort to the physical characteristics of the riverbank is a method of ascertaining the historical levels of water where more accurate measurements are unavailable. Here, we have data accurate to two decimal points and need not rely on physical inspection of vegetation to tell how high the water has risen over time. Moreover, in a reservoir the water level is under the control of man and may fluctuate from month to month and from year to year in only a grossly predictable manner. Thus, the visible vegetation line may be a reflection of only recent events in the reservoir. We conclude the "vegetation test," like the mathematical averaging test, is unsuitable for present purposes.