STATE of Utah, Plaintiff and Appellee,

v.

Ralph LeRoy MENZIES, Defendant
and Appellant.

No. 880161.

Supreme Court of Utah.

March 29, 1994.

Rehearing Denied July 20, 1994.

R. Paul Van Dam, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Brooke C. Wells, Joan C. Watt, Richard G. Uday, Salt Lake City, for defendant and appellant.

ZIMMERMAN, Chief Justice:

Ralph LeRoy Menzies appeals his 1988 jury conviction for capital murder and the trial court's subsequent imposition of the death penalty. Menzies raises numerous claims of error in the guilt and penalty phases of his trial, including (i) failure to remove five jurors for cause; (ii) failure to grant a mistrial following "surprise" testimony; (iii) admission of preliminary hearing testimony of a jailhouse informant; (iv) consideration of a heinousness aggravating circumstance during the penalty phase; (v) admission of victim impact evidence during the penalty phase; and (vi) use of the incorrect standard in sentencing Menzies to death. We affirm the conviction and sentence.

As background, we recite those facts that are largely undisputed. At approximately 9:50 p.m. on Sunday, February 23, 1986, Salt Lake County Sheriff's deputies were dispatched to the Gas–A–Mat station located at 3995 West 4700 South. The deputies found customers waiting to pay, but the cashier's booth empty and the door locked. The station attendant, Maurine Hunsaker, was missing, although her coat was still in the booth and a radio was playing. A preliminary accounting indicated that approximately $70 in cash was missing from the register.[1]

At approximately 11:05 that same night, Maurine telephoned her husband, Jim, at their home. Deputy Scott Gamble was with Jim at the time. Maurine told her husband that she had been robbed and kidnapped, but that her abductor(s) intended to release her sometime that night. Deputy Gamble also spoke with Maurine, and she again indicated that a robbery had occurred. However, Deputy Gamble was unable to get a clear answer regarding the kidnapping. Maurine also refused, or was unable, to answer Gamble's question regarding her location. When Jim again spoke with his wife, she asked him what she should do. The line then went dead.

At approximately 5 p.m. on Tuesday, February 25, 1986, a hiker discovered Maurine Hunsaker's body at the Storm Mountain picnic area in Big Cottonwood Canyon. She had been strangled and her throat cut. Her purse, which had not been found at the gas station, was not with the body or in the immediate area. That same evening, a jailer at the Salt Lake County Jail found several identification cards belonging to Maurine Hunsaker in a desk drawer in one of the jail's changing rooms. He recognized the picture on the driver's license as a woman reported missing the night before on television news.

Detectives later determined how the cards got into the drawer. Menzies had been booked into the jail on unrelated charges at approximately 6:40 p.m. on Monday, February 24, 1986. He left the booking area for a short time without supervision and was found in a changing room. Shortly thereafter, Maurine Hunsaker's identification cards were found in a clothing hamper in that room. Unaware of the kidnapping, the officer who found the cards placed them in the desk drawer where the jailer found them Tuesday night.

Also on Tuesday evening, a high school student named Tim Larrabee was watching the news and learned that a hiker had discovered a woman's body at Storm Mountain. On Wednesday, Larrabee notified deputies that he and his girlfriend, Beth Brown, had skipped school on Monday, February 24th, and were at Storm Mountain. Larrabee had

---

1. An area manager for Gas–A–Mat later conducted a more thorough accounting and determined that approximately $116 in cash was missing.

noticed a full-sized, two-door, late–1960s model, cream-colored automobile in the parking lot. He said that the vehicle was similar in appearance to a 1968 Buick Riviera. Larrabee and Brown also saw a man and woman at the site but saw nothing unusual happening between the two. They later heard a short scream, but Larrabee thought that the woman had slipped or had been frightened by an animal. Approximately fifteen minutes later, Larrabee saw the man walking alone. Neither Larrabee nor Brown saw the woman again.

Larrabee described the suspect as a white male, 25–30 years of age, 6'1" tall, with a medium build (approximately 170 pounds), black, curly hair, prominent sideburns and a mustache, and wearing wire-rimmed glasses. A detective created a composite drawing of a possible suspect based on this description. After learning that Maurine's identification cards had been found at the jail, sheriff's detectives compared the composite drawing with the photographs of more than two hundred inmates who had been booked into the facility from February 23rd through the 25th. Three photographs were chosen as possible matches, including that of defendant Menzies.

Detective Jerry Thompson questioned Menzies regarding the Hunsaker homicide. Menzies said that on Sunday, February 23rd, he borrowed a car from Troy Denter and picked up a young woman on State Street that evening. He told the detective that while with this woman, he picked up his girlfriend, Nicole Arnold, and drove around until the two women began to argue. Menzies reportedly dropped off Nicole and then left the unidentified woman somewhere around 7200 West and 2400 South. According to Menzies, he then went home, where he talked with Nicole.

On February 28th, detectives questioned Denter. He told them he loaned his cream-colored 1974 Chevrolet to Menzies on Sunday, February 23rd, sometime in the afternoon. He said that Menzies did not return the car until the afternoon of Monday, February 24th. Detectives then took Larrabee and Brown to the jail parking lot, where they identified Denter's car as the one they saw at Storm Mountain. They were also shown a photospread consisting of six photographs. Larrabee indicated that Menzies appeared to be the man he saw at Storm Mountain. Several months later, however, Larrabee did not correctly identify Menzies in a lineup.

Detectives found Maurine Hunsaker's fingerprint in Denter's car and located her purse in Menzies' apartment. Menzies was charged with first degree murder, a capital offense. See Utah Code Ann. § 76–5–202.[2] After the charges were filed, Walter Britton, Menzies' cell mate, contacted detectives about the homicide. Britton said that on February 27th, Menzies told him that he killed Hunsaker to prevent her from testifying against him.

Following a month-long trial, a jury convicted Menzies of capital homicide and aggravated kidnapping. After Menzies waived the jury in the penalty phase, the trial judge sentenced him to death. Menzies then moved for a new trial, arguing that errors in recording and transcribing made the record inadequate for purposes of appellate review. The trial court denied the motion, and this court affirmed, ordering Menzies to proceed with the appeal on the merits. State v. Menzies, 845 P.2d 220 (Utah 1992). We now address Menzies' contentions.

Menzies' first issue on appeal deals with the jury selection process. He claims that the trial court should have removed four jurors for cause because of their attitudes regarding the death penalty and a fifth because that juror was unable to be impartial during the guilt phase of the trial. Menzies removed all five by peremptory challenge. He now asserts that the trial court committed reversible error by forcing defense counsel to use a peremptory strike to remove potential jurors when the trial court should have removed those jurors for cause. Menzies makes no attempt to demonstrate that the forced use of any of these peremptory challenges was harmful. Instead, he relies

---

**2.** The current version of section 76–5–202 substitutes the term "aggravated murder" for murder in the first degree.

on the automatic reversal rule of *Crawford v. Manning,* 542 P.2d 1091 (Utah 1975), and its progeny. Under these cases, reversal is required whenever a party is compelled "to exercise a peremptory challenge to remove a panel member who should have been stricken for cause." *State v. Bishop,* 753 P.2d 439, 451 (Utah 1988); *see also Crawford,* 542 P.2d at 1093.

■ The State, on the other hand, asks us to overturn the *Crawford* line of cases and follow the approach utilized by a majority of the states and upheld by the federal courts. Those following the majority approach "reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the [Constitution] was violated." *Id.* (citing *Hopt v. Utah,* 120 U.S. 430, 436, 7 S.Ct. 614, 616, 30 L.Ed. 708 (1887)). To prevail on a claim of error based on the failure to remove a juror for cause, a defendant must demonstrate prejudice, *viz.,* show that a member of the jury was partial or incompetent. *See id.,* 487 U.S. at 89, 108 S.Ct. at 2278. We agree with the State and overrule *Crawford* and its progeny.

We note at the outset that *Crawford*'s per se rule is a relatively recent development in Utah law. Utah case law dating back to territorial times did not presume prejudice when a trial court erroneously failed to remove a prospective juror for cause and forced a party to use a peremptory challenge. For example, in *People v. Hopt,* 4 Utah 247, 9 P. 407 (1886), *aff'd,* 120 U.S. 430, 442, 7 S.Ct. 614, 620, 30 L.Ed. 708 (1887), an early death penalty case, the defendant complained that he was prejudiced because the court had failed to excuse three jurors for cause. The defendant did not exhaust all of his peremptory challenges, and one of the three challenged jurors sat on the jury. On appeal, this court held:

> [A] perfect answer to the point raised is that of the three jurors challenged two were not sworn. One was challenged per-

emptorily by the defendant, and one by the people. Whether, therefore, the challenges were properly denied or not, they did not sit as jurors; the defendant was not prejudiced by the ruling.

*Id.* 9 P. at 408; *see also Van Wagoner v. Union Pac. R.R.,* 112 Utah 189, 186 P.2d 293, 298–99 (1947); *State v. Cano,* 64 Utah 87, 228 P. 563, 568 (1924); *State v. Thorne,* 41 Utah 414, 126 P. 286, 291 (1912). As for the challenged juror who actually sat, this court recognized that the defendant still had peremptory challenges remaining and held that until the defendant exhausted his peremptory challenges he could not complain about the composition of the jury. *Hopt,* 9 P. at 408; *see also State v. Wetzel,* 868 P.2d 64, 66–67 (1993); *State v. Wood,* 868 P.2d 70, 76 (1993).

*Hopt* remained the rule in Utah until our 1975 *Crawford* decision. In *Crawford,* a civil case, the plaintiffs exercised one of their three allotted peremptory challenges to remove a panelist whom the trial court should have removed for cause. Although six of eight jurors would have been sufficient to return a verdict and the jury unanimously found against the plaintiffs, this court refused to conclude that the error was harmless. *Crawford,* 542 P.2d at 1093. In reversing the jury verdict, Justice Ellett asserted, "By exercising one of their peremptory challenges upon this prospective juror, plaintiffs had only two remaining. The juror which remained because the plaintiffs had no challenge to remove him may have been a hawk amid seven doves and imposed his will upon them." *Id.* Interestingly, Justice Ellett made this assertion even though the plaintiffs did not complain that any of the jurors who sat were biased or prejudiced against them.

■ Those asking us to overturn prior precedent have a substantial burden of persuasion. *See State v. Hansen,* 734 P.2d 421, 427 (Utah 1986). This burden is mandated by the doctrine of stare decisis. In *State v. Thurman,* 846 P.2d 1256 (Utah 1993), we discussed stare decisis in the context of multiple panels of the court of appeals and emphasized the importance of its observance:

This doctrine, under which the first decision by a court on a particular question of law governs later decisions by the same court, is a cornerstone of the Anglo–American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication.

*Id.* at 1269.

 In *Thurman*, we made it clear that the doctrine applies as between different panels of the court of appeals. *Id.*[3] Certainly the doctrine also applies to a court of last resort, such as a state supreme court. Nevertheless, we wish to make clear that the doctrine is neither mechanical nor rigid as it relates to courts of last resort. *See Staker v. Ainsworth*, 785 P.2d 417, 423–24 (Utah 1990); *American Fork City v. Crosgrove*, 701 P.2d 1069, 1071–75 (Utah 1985).

> The general American doctrine as applied to courts of last resort is that a court is not inexorably bound by its own precedents but will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.

John Hanna, *The Role of Precedent in Judicial Decision*, 2 Vill.L.Rev. 367, 367 (1957); *see also Francis v. Southern Pac. R.R.*, 333 U.S. 445, 471, 68 S.Ct. 611, 623, 92 L.Ed. 798 (1948) (Black, J., dissenting) ("When precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it."). Although we do not do so lightly, we believe that now is the proper time to overrule *Crawford*. Because we are departing from a prior precedent that has been followed for approximately twenty years, it is incumbent on us to explain why we overrule it. *Cf. Hansen*, 734 P.2d at 427.

We note that *Crawford* is not the most weighty of precedents. First, in establishing *Crawford*'s per se rule, Justice Ellett not only failed to explain why he was abandoning the long-established *Hopt* rule, see *Monell v. Department of Social Servs. of New York*, 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978), but failed to cite that line of cases altogether. Because the briefs in *Crawford* addressed the issue only tangentially and never cited the *Hopt* line of cases, it seems likely that Justice Ellett and the rest of the court did not even realize that they were departing from well-established Utah precedent. *See* 20 Am.Jur.2d *Courts* § 193 (1965) ("[S]tare decisis effect of case is substantially diminished by the fact that the legal point therein was decided without argument.").

Second, Justice Ellett established the per se rule with little analysis and without reference to authority. In other situations where we have established presumptions of harm, we have carefully discussed the reasons for taking such an unusual step. *See, e.g., State v. Crowley*, 766 P.2d 1069, 1071–72 (Utah 1988) (closure of trial to friends and relatives of accused); *State v. Knight*, 734 P.2d 913, 920–22 (Utah 1987) (prosecutor's failure to

---

**3.** We note that the doctrine of stare decisis, as it applies to a court of appeals, has two facets. Vertical stare decisis, the first of these two facets, compels a court to follow strictly the decisions rendered by a higher court. *See Jaffree v. Board of School Comm'rs*, 459 U.S. 1314, 1316, 103 S.Ct. 842, 843, 74 L.Ed.2d 924 (Powell, Circuit Justice 1983); *In re Marriage of Thorlin*, 155 Ariz. 357, 362, 746 P.2d 929, 934 (Ct.App.1987). Under this mandate, lower courts are obliged to follow the holding of a higher court, as well as any "judicial dicta" that may be announced by the higher court. *See Lewis v. Sava*, 602 F.Supp. 571, 573 (D.C.N.Y.1984); *Fogerty v. State*, 187 Cal.App.3d 224, 231 Cal.Rptr. 810, 815 (1986); *Ex parte Harrison*, 741 S.W.2d 607, 608–09 (Tex. Ct.App.1987). *See generally* Robert E. Keeton, *Venturing To Do Justice: Reforming Private Law* 25–38 (1969); 21 C.J.S. *Courts* § 142, at 169–70 (1990). Horizontal stare decisis, the second facet, requires that a court of appeals follow its own prior decisions. This doctrine applies with equal force to courts comprised of multiple panels, requiring each panel to observe the prior decisions of another. *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993). Horizontal stare decisis does not, however, require that a panel adhere to its own or another panel's prior decisions with the same inflexibility as does vertical stare decisis. *See Opsal v. United Servs. Auto Ass'n*, 2 Cal.App.4th 1197, 10 Cal.Rptr.2d 352, 356 (1991); *State v. Dungan*, 149 Ariz. 357, 361, 718 P.2d 1010, 1014 (1986). Instead, although it may not do so lightly, a panel may overrule its own or another panel's decision where "the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable." *Dungan*, 149 Ariz. at 361, 718 P.2d at 1014.

disclose materials sought by defense); *State v. Cloud,* 722 P.2d 750, 752–54 (Utah 1986) (gruesome photographs).

Third, in addition to *Crawford*'s lack of acknowledgement of authority and its weak analytical underpinnings, this court has concluded that its per se rule does not work very well. *See* 20 Am.Jur.2d *Courts* § 187 (1965). This conclusion is evidenced by our straining to find that no error has occurred, thus avoiding *Crawford*'s mechanical reversal requirement. *See, e.g., Wood,* 868 P.2d at 80 (holding "trial judge was at the very limit of his discretion" in refusing to remove prospective jurors for cause); *Bishop,* 753 P.2d at 451–55 (same). We think that candor in the law would be better served by abandoning *Crawford* rather than straining against its requirement by upholding trial courts' questionable for-cause determinations.

■ We conclude that even if the trial court erred in failing to remove those prospective jurors whom Menzies found objectionable, that error was harmless. *See* Utah R.Crim.P. 30(a). Menzies has not asserted that he faced a partial or biased jury during the guilt phase of his trial or that the jury was made more likely to convict as a result of "death qualifying" the jury. *Cf. State v. Young,* 853 P.2d 327, 342, 386–95, 414–17 (Utah 1993). Furthermore, while the bulk of Menzies' objections to potential jurors revolved around those individuals' views on the death penalty, the penalty phase was tried to the court rather than to the jury.

■ Menzies next claims that the trial court erred in denying his motion for a mistrial following "surprise" testimony by Tim Larrabee, the high school student who saw a man and a woman at the Storm Mountain picnic area the day of the homicide. This claim of surprise arose from a lineup conducted by the sheriff's office in which Larrabee identified someone other than Menzies as the individual he saw at Storm Mountain. At trial, the prosecutor did not ask Larrabee

about the lineup during his case-in-chief. On cross-examination, however, Larrabee's "misidentification" was brought out by the defense. On redirect, the prosecutor asked Larrabee about a conversation the two of them had while walking back to the prosecutor's office after the lineup. Larrabee testified that during the walk, he asked the prosecutor whether "number 6" was the correct person. Number six was Menzies.

Because the prosecution had never informed defense counsel about the post-lineup conversation, defense counsel moved to strike the testimony "concerning [Larrabee's] equivocation of the lineup selection" and requested that the court admonish the jury not to consider that testimony. The trial court granted the motion, struck the testimony, and instructed the jury to disregard it. Later that day, the defense moved for a mistrial, but the motion was denied. Menzies now claims that the trial judge erred in denying the motion for mistrial.

Menzies' argument is twofold. First, he claims that the State violated rule 16 of the Utah Rules of Criminal Procedure in failing to disclose Larrabee's post-lineup statement. Second, Menzies claims that this failure to disclose the conversation violated his right to due process under the federal constitution because the post-lineup statement was critical to the prosecution's case. Because of our disposition of the rule 16 question, we need not indulge in a separate due-process analysis.

■ Under our decision in *Knight,* when a prosecutor undertakes to respond voluntarily to discovery requests from the defense, the prosecutor either must produce "all of the material requested or must explicitly identify those portions of the request with respect to which no responsive material will be provided." 734 P.2d at 916–17. This obligation is ongoing and is justified as a guard against misleading the defense by an incomplete prosecutorial response to discovery. If a violation of this duty is found, the

trial court may fashion a remedy under rule 16(g).[4]

■ A complaint that the trial court failed to order a requested remedy or that the remedy ordered was insufficient to obviate the harm resulting from the violation is reviewed under an abuse-of-discretion standard. *Id.* at 918–19. The trial court's discretion in fashioning a remedy for a violation is not abused unless prejudice sufficient to result in a reversal of the conviction occurred due to the discovery violation. *Id.*

In the present case, the trial court found that the State had failed to disclose requested information. For purposes of our analysis today, we accept that ruling as correct. Defense counsel asked the trial judge to strike the testimony of Larrabee regarding the post-lineup discussion with the prosecutor. The trial judge granted that motion and admonished the jury to disregard the testimony. Later in the day, defense counsel requested the further remedy of a mistrial. The judge denied that request. To conclude that an abuse of discretion occurred, we must find that unacceptable prejudice to Menzies remained after the testimony was stricken. This we cannot do.

■ We generally presume that a jury will follow the instructions given it. *State v. Burk,* 839 P.2d 880, 883–84 (Utah Ct.App. 1992) (citing *State v. Hodges,* 30 Utah 2d 367, 517 P.2d 1322, 1324 (1974)), *cert. denied,* 853 P.2d 897 (Utah 1993). Here, the testimony consisted of a very brief series of questions and answers. The court promptly ordered the colloquy stricken and admonished the jury to ignore it. Considering the ambiguous nature of the testimony and the fact that it was not vivid or graphic, there is no reason to believe that the jury would be uniquely unable to follow the court's instructions and ignore the testimony. As such, the remedy ordered was entirely sufficient to cure the discovery violation.

■ Even if we were to assume that for some reason this testimony were of such a dramatic nature that the jury was likely to consider it despite the court's instructions, we still find no harm. When Larrabee first contacted the sheriff's office, he described a suspect within one inch in height and ten pounds in weight of Menzies. He accurately described Menzies' hair, facial hair, and glasses and helped create a composite drawing that was so accurate that detectives were able to select Menzies' photograph from among those of 200 inmates. Larrabee also accurately described and identified Denter's car. There was other substantial evidence linking Menzies to the homicide, including the victim's fingerprint in Denter's car. In light of all this, the fact that on redirect Larrabee mentioned that he had some notion that Menzies was the person he should have picked in the lineup is hardly pivotal to Menzies' conviction. We conclude that it is extraordinarily unlikely that any prejudice that might have survived the striking of Larrabee's testimony had any effect on the jury, and certainly not an effect that would rise to the level necessary to require reversal. The trial court did not abuse its discretion in refusing the motion for a mistrial.

Menzies next asserts that the trial court erred in allowing the preliminary hearing testimony of Walter Britton to be read to the jury. Britton, who had shared a cell with Menzies at the Salt Lake County Jail, testified at the preliminary hearing that Menzies told him he killed Maurine Hunsaker. At the time of trial, however, Britton refused to testify despite a finding of contempt by the court. The court thus ruled that Britton was "unavailable" as defined in rule 804(a)(2) of the Utah Rules of Evidence,[5] making the

---

4. Rule 16(g) provides:

 If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

5. Rule 804 of the Utah Rules of Evidence provides in pertinent part:
 (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:
 . . . ;
 (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;
 . . . .

transcript of his preliminary hearing testimony admissible under that rule. The defense moved to suppress the transcript, but the motion was denied.

Menzies now argues that the admission of Britton's preliminary hearing testimony violated his right to confrontation under the Sixth Amendment of the United States Constitution. Specifically, he claims that the trial court erred in finding Britton unavailable because the prosecution did not make a good faith effort to procure Britton's testimony. Menzies further claims that even if Britton was actually unavailable, the preliminary hearing testimony should not have been admitted because the defense did not have the opportunity to properly develop the testimony it wanted brought out at trial during cross-examination, a prerequisite to admissibility under the Confrontation Clause. In response, the State asserts that because Britton was physically present at trial, the Confrontation Clause was not implicated.

Although Britton's testimony was admissible under rule 804, we have recognized that the "admission of certain evidence could be justified under a hearsay exception [to the rules], yet still violate the defendant's constitutional right of confrontation." *State v. Webb*, 779 P.2d 1108, 1111–12 (Utah 1989) (separate opinion of Zimmerman, J.); *State v. Anderson*, 612 P.2d 778, 785 n. 31 (Utah 1980). As a result, we must determine whether admission of Britton's testimony has impinged on the values embodied in the Confrontation Clause to such a degree as to rise to the level of a constitutional violation. *Webb*, 779 P.2d at 1112 (separate opinion of Zimmerman, J.).

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court articulated a two-pronged test for determining the admissibility of hearsay when a hearsay declarant is not present for cross-examination at trial. First, there must be a showing of "unavailability." *Id.* at 66, 100 S.Ct. at 2539. Second, if the declarant is unavailable, the statement at issue is "admissible only if it bears adequate indicia of reliability." *Id.; see State v. Brooks*, 638 P.2d 537, 539 (Utah 1981) (adopting two-pronged test established in *Roberts* ).

Addressing the first prong of the test, constitutional unavailability is found only when it is "practically impossible to produce the witness in court." *Webb*, 779 P.2d at 1113 (separate opinion of Zimmerman, J.); *see State v. White*, 671 P.2d 191, 193 (Utah 1983); *State v. Chapman*, 655 P.2d 1119, 1122 (Utah 1982); *State v. Case*, 752 P.2d 356, 358 (Utah Ct.App.), *cert. denied*, 765 P.2d 1277 (Utah 1987). Unavailability will not be found merely because "the witness would be uncomfortable on the stand or ... testifying would be stressful." *Webb*, 779 P.2d at 1113 (separate opinion of Zimmerman, J.). In short, every reasonable effort must be made to produce the witness. *Id.* (separate opinion of Zimmerman, J.). Here, the record indicates that Britton was physically present at trial, pursuant to a court order, and repeatedly refused to testify despite the judge's order to do so. We conclude that every reasonable effort was made to produce Britton at trial, and the trial court correctly concluded that Britton was unavailable.

In the second step of our Confrontation Clause analysis, we must determine whether Britton's preliminary hearing testimony bore sufficient indicia of reliability to warrant its admission at trial. Menzies admits that preliminary hearing testimony usually meets the reliability standard, *Brooks*, 638 P.2d at 540, but argues that the prior testimony at issue here was unreliable be-

A declarant is not unavailable as a witness if the ... refusal ... is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying.

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
Utah R.Evid. 804.

cause (i) Britton was a jailhouse informant whose testimony was inherently suspect as he stood to benefit from the testimony; (ii) his mental competence was at issue and Menzies was not aware of this until after the preliminary hearing; and (iii) defense counsel did not have the opportunity to examine Britton at the preliminary hearing regarding his subsequent convictions. The State asserts that the testimony was reliable because Britton's testimony was given under oath before a judge and Menzies was represented by counsel who had the opportunity to cross-examine Britton.

We agree with the State. The critical issue of reliability relates to the preliminary hearing testimony, not to Britton's potential testimony at trial. The defense contends that its cross-examination of Britton would have been *more* effective at trial because of events that occurred after the preliminary hearing and information that became known after that time. While that assertion may be true, as we have recognized previously, "The Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Seale,* 853 P.2d 862, 873 (Utah) (quoting *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

Here, the transcript of the preliminary hearing shows that the defense had the opportunity for an effective cross-examination of Britton. While we agree that new evidence obtained after the hearing may have aided an attack on Britton's credibility on cross-examination, the preliminary hearing transcript indicates that the issue was well-explored. Defense counsel brought out Britton's criminal history, including pending charges against him, as well as the fact that Britton might receive more favorable treatment by the courts because of his cooperation with law enforcement officials. Furthermore, the defense introduced extrinsic evidence related to Britton's credibility at trial and might have introduced other credibility-related evidence as well. For example, the trial transcript indicates that Britton had

been incarcerated in a mental health section of the county jail before the preliminary hearing was held.

Reviewing the preliminary hearing testimony as a whole, we find it contains sufficient indicia of reliability to warrant its admission at trial. We therefore conclude that the requirements of the Confrontation Clause have been met.

■ Although not argued below, Menzies now contends that the trial court committed plain error by not excluding portions of Britton's testimony under rule 403 of the Utah Rules of Evidence. Specifically, Menzies claims that he was unfairly prejudiced by Britton's testimony to the effect that Menzies had said cutting Maurine Hunsaker's throat was "one of the biggest thrills that he'd had." In addition, Menzies argues that Britton's testimony that Menzies laughed about the homicide should also have been excluded.

■ We first note that the defense waived the rule 403 issue by failing to interpose an objection to these statements at trial. As a result, Menzies is entitled to appellate review only if he can show that the trial court committed "plain error." *State v. Eldredge,* 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Verde,* 770 P.2d 116, 121 (Utah 1989). To find plain error, Menzies must establish three elements: (i) An error occurred; (ii) the error was obvious; and (iii) the error was harmful. *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993); *see Verde,* 770 P.2d at 122. If any one of these elements is missing, there can be no finding of plain error. *Dunn,* 850 P.2d at 1209.

■ Here, we dispose of Menzies' challenge under the first element. Rule 403 requires that proffered evidence be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Utah R.Evid. 403. Such a weighing should result in exclusion when the evidence would have "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, on an emotional one.'" *State v. Maurer,* 770 P.2d 981, 984 (Utah 1989) (quoting Fed.R.Evid. 403 adviso-

ry committee's note). To find that an error has been made in admitting evidence in the face of a rule 403 objection, we must conclude that the trial court abused its discretion in permitting the challenged evidence to be received. Specifically, we must find that the ruling in favor of admissibility was beyond the limits of reasonability. *State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992).

■ Our review of the transcript does not lead us to the conclusion that the trial court exceeded the bounds of its discretion in admitting the two challenged statements. While we agree that Britton's testimony is inflammatory, we do not conclude that it reaches the level of mandatory exclusion. *Cf. Maurer,* 770 P.2d at 984–86 (analyzing letter written by murderer to victim's father); *Bishop,* 753 P.2d at 476–77 (plurality opinion of Hall, C.J.) (discussing gruesome photographs); *id.* at 493 (opinion of Zimmerman, J.) (same); *Cloud,* 722 P.2d at 752–53 (same); *State v. Garcia,* 663 P.2d 60, 64–65 (Utah 1983) (same). We think that the defense has taken the statement regarding Menzies' thrill at cutting someone's throat out of context and has placed undue emphasis on it here:

A Yes, sir. I asked him why he killed her—I asked him why he shot her, because I did not know how she was killed.

Q What did he say?

A. He stated that he didn't shoot her, that he cut her throat.

Q Did you ask him anything else?

A Not upon that night. It wasn't until the next morning, I believe, that we talked further.

Q In that initial conversation, did he give you any more details regarding the murder?

A No, sir, not really. It wasn't until after we had spoken again, which was the next morning, that he really went into details on it.

Q Where did that second conversation take place the next morning?

A That second conversation took place in the same place, there in the tier.

Q And how did that conversation come about?

A That conversation came about upon our awakening, and he started talking to me. And he'd asked me if I had ever cut anybody's throat before.

Q What did you say to that?

A I said yes, sir, I have.

Q What did he say next?

A And he said it was one of the biggest thrills that he'd had.

■ As for the statement about Menzies' laughing when he spoke of the homicide, we note that this statement was elicited during cross-examination by the defense. Furthermore, this statement was made in response to questions regarding possible confrontations between Britton and Menzies at the county jail; there was no reference to the Hunsaker homicide itself during the exchange. In fact, the homicide itself had not been mentioned by defense counsel for approximately ten transcript pages before the statement. We find no merit to the claim of plain error.

■ Menzies argues that in the penalty phase of the trial, the judge improperly considered heinousness as an aggravating circumstance and, therefore, he is entitled to a new penalty phase. Because the objection was not raised at trial, we again must consider whether there was plain error.

The Utah Code provides that the death penalty may be sought when

[t]he homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death.

Utah Code Ann. § 76–5–202(1)(q). In *State v. Tuttle,* 780 P.2d 1203, 1217 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990), decided after this case was tried, we said that for subpart (q) to pass federal constitutional muster under the Supreme Court's decision in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), "the physical abuse must be qualitatively and quantitatively different and more

culpable than that necessary to accomplish the murder." Menzies now argues that the circumstances surrounding the homicide with which he was charged did not rise to the level of heinousness required by the United States Constitution as construed in *Tuttle*.

In its closing argument, the State listed the aggravating factors it wanted the court to consider and stated that one such factor was "the brutal and heinous nature of the murder." The prosecutor, however, did not refer the court to the "heinous" provision in section 76–5–202(1)(q) of the Code. When the trial court enumerated the aggravating and mitigating factors at the time of sentencing, it noted subpart (q). While we think that it would have been error for the court to consider subpart (q) satisfied by the facts of this case and to use that finding as an aggravating factor, we are not convinced that such an error occurred. The trial judge was certainly aware of our previous decisions limiting capital murders deemed ruthless and brutal to those "involving an aggravated battery or torture." *State v. Wood*, 648 P.2d 71, 86 (Utah 1981) (construing and applying *Godfrey*), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). While we are uncomfortable with the trial judge's references to subpart (q), we have no solid reason to believe that the judge thought this was an appropriate situation for reliance on the heinousness factor listed in 76–5–202(1)(q).

Furthermore, we note that the judge could have properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under section 76–3–207(2). In this guise, the various facts of the crime that Menzies says do not rise to the level of constitutional and statutory heinousness could still have been considered. Therefore, even if we were to assume that the court erred in considering heinousness, we think that the error was harmless because we "can

still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." *State v. Archuleta*, 850 P.2d 1232, 1248 (Utah), *cert. denied*, —— U.S. ——, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993).

■ Menzies next argues that the trial court erred by relying on victim impact evidence during the penalty phase in violation of article I, section 9 of the Utah Constitution. Because Menzies did not object to the victim impact evidence at trial, we must consider this claim under a plain-error analysis. *Eldredge*, 773 P.2d at 35. Again, to find plain error, we must find that (i) an error occurred, (ii) the error was obvious, and (iii) the error was harmful. *Dunn*, 850 P.2d at 1208.

Menzies claims that at the time of the sentencing phase, the United States Supreme Court's decision in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), prevented the consideration of victim impact evidence as a violation of the Eighth Amendment of the United States Constitution. Because the trial judge should have been aware of this ruling, Menzies argues that an obvious error occurred when the evidence was considered during sentencing.

We do not agree. In *Booth*, the Court's concern appeared to be based on the fact that victim impact evidence created "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 503, 107 S.Ct. at 2533. With no jury sitting during the penalty phase, we do not think that *Booth*'s application to this case should have been obvious to the trial judge. *Cf. State v. Rimmasch*, 775 P.2d 388, 407 (Utah 1989) ("Erroneous admissions of evidence are not as critical in a bench trial as where a jury is involved....").[6]

---

6. In concluding that the trial court did not commit plain error in admitting victim impact evidence, we do not decide whether victim impact evidence is admissible under the Utah Constitution. *See State v. Carter*, 888 P.2d 629, 654 n. 38 (Utah 1995). Furthermore, in light of the fact that we recently held for the first time that section 76–2–207 of the Code prohibits the introduction of victim impact evidence, *id.* at 651–52, we cannot conclude that the trial court committed plain error when it admitted the evidence at issue here in a trial held before our recent pronouncement. *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

Finally, Menzies argues that the trial court failed to apply the standard set forth in *Wood,* 648 P.2d at 83–84, in imposing the death penalty. There, we held that in order to impose the death penalty, the sentencing body must find beyond a reasonable doubt that the substantiality or persuasiveness of the aggravating factors outweighs that of the mitigating factors, and must then conclude, also beyond a reasonable doubt, that the death penalty is appropriate. *Id.*

Menzies asserts that the trial court failed to properly weigh the aggravating and mitigating factors and then incorrectly concluded that the death penalty was appropriate. We do not agree. The first prong of *Wood* requires that the sentencing body find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. 648 P.2d at 83–84. While we realize that the trial judge recited a number of factors during the sentencing proceeding, the record indicates that he weighed those factors in the manner required by *Wood:*

> The court has, to the best of the court's ability, weighed and evaluated the mitigating circumstances and the aggravating circumstances. And the conclusion the court has reached is that based on the aggravating and mitigating circumstances, the court concludes that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

In addition, *Wood* requires that the sentencing body find that the death penalty is the appropriate penalty beyond a reasonable doubt. 648 P.2d at 84. Again, the record indicates that the trial judge properly applied the law:

> Consequently, this court, with the heaviest of hearts, makes the more difficult and trying decision that under the circumstances and beyond a reasonable doubt,

the death penalty is the appropriate penalty, and the court so orders.

We therefore find no merit to Menzies' claim that the trial judge applied an inappropriate standard when he sentenced Menzies to death.

▪ Menzies also points out that the trial judge did not make written findings that the prior bad acts evidenced by material found in his prison file had been proven beyond a reasonable doubt, as required by our decision in *State v. Lafferty,* 749 P.2d 1239 (Utah 1988), *habeas corpus granted on other grounds, Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1992). While we have required written findings regarding unadjudicated bad acts if the sentence is determined by a judge, we have not said that such findings are constitutionally required and that a failure to make such findings mandates reversal. *Id.* at 1260 n. 16. Rather, we can look to the other evidence before the trial court to be certain that the death sentence would have been imposed even without the improper evidence. *Id.* Reviewing the record before us, we think that the error was harmless. The prior bad acts referred to are quite minor when compared to the other evidence of aggravating circumstances. We conclude that the facts indicate "beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate," despite the trial court's consideration of the prison file. *See Archuleta,* 850 P.2d at 1248. Therefore, any error was harmless. *See Lafferty,* 749 P.2d at 1261 (citing *State v. Hackford,* 737 P.2d 200, 204–05 & n. 3 (Utah 1987)).

We find Menzies' other claims to be without merit.[7] Based on the foregoing, we af-

---

7. In his dissenting opinion, Justice Stewart takes aim at the majority's failure to address each of defendant's forty-four claims of error. We note that the sheer number of errors alleged is no measure of the merits of those claims. The majority has dealt with those claims of error that are deserving of attention.

Justice Stewart also asserts that the trial court's instruction on the State's burden of proof was undeniably in error, citing *State v. Johnson,* 774 P.2d 1141, 1147–48 (Utah 1989) (Stewart, J.,

concurring in the result, joined by Zimmerman and Durham, JJ.), and *State v. Ireland,* 773 P.2d 1375, 1380 (Utah 1989). In his *Johnson* opinion, decided after this case was tried, when faced with an instruction in all pertinent respects identical to the instruction at issue here, Justice Stewart concluded that although the instruction was incorrect, it did "not rise to the level of reversible error." 774 P.2d at 1147 (Stewart, J., concurring in the result, joined by Zimmerman & Durham, JJ.).

firm the jury's verdict and the trial court's subsequent sentence.

HOWE and DURHAM, JJ., and BENCH, Court of Appeals Judge, concur.

STEWART, Associate Chief Justice, concurring in part and dissenting in part:

I concur in that part of the majority opinion that overturns the rule requiring reversal when a party has been compelled to exercise a peremptory challenge to remove a juror who should have been removed for cause. I emphasize, however, that if a trial judge errs in not striking a juror on a for-cause challenge and a defendant then expends a peremptory challenge to remove that juror, reversal may still be required if the defendant can demonstrate actual prejudice in having lost the peremptory challenge. Concededly, it will be much more difficult to establish reversible error under this rule, but the cost of reversing a conviction for an error of the trial judge that is corrected by a peremptory challenge with no demonstrable prejudice to the defendant is too great, if not irrational.

I dissent from the result and note that this case has been mishandled from the beginning. First, the transcript of the trial and penalty phase contains a multitude of errors, and portions of that transcript may be missing. This caused Menzies to challenge the sufficiency of the record for appellate review. *State v. Menzies*, 845 P.2d 220, 224 (Utah 1992). The Court, however, rejected Menzies' assertion that the record was unreliable and held that the errors in the transcript were not prejudicial, although accuracy of the transcript was at best problematic. *Id.* I thought then that the case should have been retried, and I dissented from the Court's opinion.

Defendant now asserts forty-four claims of error on appeal. The majority decides to address only six and summarily dismisses the remaining thirty-eight on the unexamined, conclusory assertion that they are all without merit. Although some of the issues lack sufficient merit to require discussion, some of them raise substantial claims that should be addressed. For example, the trial court's instruction on the State's burden of proof was undeniably in error. It violated the clear ruling of this Court in *State v. Johnson*, 774 P.2d 1141, 1147–48 (Utah 1989) (Stewart, J., concurring in the result, joined by Durham and Zimmerman, JJ.). *See State v. Ireland*, 773 P.2d 1375, 1380 (Utah 1989); *Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990) (per curiam) (United States Supreme Court adopted similar position and held that erroneous reason-

---

More importantly, however, we note that the instant instruction was proper under legal principles in place at the time it was given. Two months before Menzies went to trial, this court approved a reasonable doubt instruction substantively identical to the one at issue here in *State v. Tillman*, 750 P.2d 546, 572–73 (Utah 1987). It was not until one year after Menzies' trial that we expressed in *Johnson* and *Ireland* our disapproval of the "weighty affairs" and "possible or imaginary" language. Despite Justice Stewart's suggestion to the contrary, this change in the law is not entitled to retroactive application under our holding in *State v. Norton*, 675 P.2d 577 (Utah 1983), *overruled on other grounds, State v. Hansen*, 734 P.2d 421, 427 (Utah 1986). In *Norton*, we recognized that "when this Court established a new rule of law on an essential element of a crime, a criminal defendant whose direct appeal was pending was entitled to the benefit of the new rule for the resolution of his appeal." *Id.* at 583. We went on to emphasize, however, that the

> automatic rule of retroactivity as to nonfinal judgments only applies to significant changes of rules *that are not expressly declared to be prospective in operation.* This qualification is

necessary to prevent automatic retroactivity from displacing the traditional rule that a new rule of criminal procedure which constitutes "a clear break from the past" will sometimes be nonretroactive.

*Id.* at 584 (emphasis added) (citing *United States v. Johnson*, 457 U.S. 537, 549, 102 S.Ct. 2579, 2586, 73 L.Ed.2d 202 (1982)). In *Ireland*, we did indicate that the change in the beyond-a-reasonable-doubt-instruction law was *not* to be retroactive. Specifically, the *Ireland* court's declaration that trial courts are to discontinue use of the "weighty affairs" and "possible or imaginary" language was made in the exercise of this court's supervisory power over lower courts. 773 P.2d at 1380. This is a clear indication that we would strike down only *future* verdicts based on the offending language. We reemphasized our intention to do so in *Johnson*, 774 P.2d at 1147 (Stewart, J., concurring in the result, joined by Zimmerman & Durham, JJ.). Because the invocation of our supervisory powers in *Ireland* demonstrates a commitment on the part of this court to prospectively prohibit the use of the offending language, the *Ireland/Johnson* rule is not entitled to retroactive application under our holding in *Norton*, 675 P.2d at 584.

able doubt instruction in that case required reversal of conviction).

The majority now addresses the issue in a footnote. It erroneously concludes that the correct rule with respect to a reasonable doubt instruction is not entitled to retroactive application. Contrary to the majority opinion, it is well-established law that a judicial opinion changing a rule of criminal law is automatically applied retroactively to criminal cases pending on direct appeal. *State v. Norton*, 675 P.2d 577, 583 (Utah 1983), *overruled on other grounds, State v. Hansen*, 734 P.2d 421 (Utah 1986); *State v. Belgard*, 615 P.2d 1274, 1275 (Utah 1980). The majority asserts that our rulings on the reasonable doubt instruction in *Ireland* and *Johnson* should not be applied retroactively to this case because " 'the automatic rule of retroactivity as to nonfinal judgments only applies to significant changes of rules that are not expressly declared to be prospective in operation.' " *Norton*, 675 P.2d at 584. The majority asserts that a proper reasonable doubt instruction is a significant change that represents a "clear break with the past." *Id.* at 583. That assertion is incorrect. A proper reasonable doubt instruction has always meant "beyond" a reasonable doubt and has meant that for a very long time.

Furthermore, neither *Ireland* nor *Johnson* "expressly declared" that they are to be applied prospectively only. The majority states that *Ireland* indicated an intent by the Court that the change in the reasonable doubt instruction was only to be applied prospectively. The language in *Ireland* that the majority refers to, however, was not in any way related to prospective or retroactive application of the decision. The Court stated that it had "concerns" with the potential effects of the instruction and that the instruction should no longer be given. As stated by the majority, a decision is automatically applied retroactively to nonfinal judgments unless we *expressly declare* otherwise. The language in *Ireland* cited by the majority does not even cite to *Norton* or any of our other cases on retroactivity. *See, e.g., Belgard*, 615 P.2d at 1275. That language hardly qualifies as an "express declaration" of prospective application. Neither does *Johnson* expressly declare that the new rule has only prospective application.

Next, I submit that it was error for the trial court to admit defendant's prison record in bulk. Due process requires that evidence submitted in the penalty phase of a capital homicide case have some degree of relevance and reliability. *State v. Brown*, 607 P.2d 261, 270 (Utah 1980) (opinion of Wilkins, J., with Maughan, J., concurring in this part of the opinion, and Stewart, J., concurring in the judgment); *see also State v. Johnson*, 856 P.2d 1064, 1071 (Utah 1993). The trial court did not evaluate either the reliability or the relevance of any of the evidence contained in the file. Although the trial judge, not a jury, imposed the death penalty, there is no way of knowing what impact, if any, the documents in that file may have had. Truth be told, judges may also be influenced by improper evidence, and at least in a death case where findings are not required, the state ought not submit, and the judge ought not admit, a whole raft of evidence, all or part of which should not be admitted.

Undoubtedly, there are also other issues that should be addressed. Nowhere is the integrity of the law more important than when a person's life is at stake. To preserve that integrity, we have gone the extra mile in death cases and addressed and decided issues even though no proper objection was made at trial when an error was manifest and prejudicial. *State v. Wood*, 648 P.2d 71, 77 (Utah 1982). Now, however, the Court summarily disposes of over thirty allegations of error with the summary statement that they are "without merit."

HALL, J., does not participate herein; BENCH, Court of Appeals Judge, sat.